1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11   HOME BUILDERS ASSOCIATION OF
     NORTHERN CALIFORNIA, BUILDING
12   INDUSTRY LEGAL DEFENSE
     FOUNDATION, CALIFORNIA
13   BUILDING INDUSTRY ASSOCIATION,
     CALIFORNIA STATE GRANGE, and
14   GREENHORN GRANGE,
                                         NO. CIV. S-05-0629 WBS-GGH
15            Plaintiffs,

16   and

17   CITY OF SUISUN,                     MEMORANDUM AND ORDER

18            Plaintiff-Intervenor,

19   and

20   TSAKOPOULOS INVESTMENTS,
     TSAKOPOULOS FAMILY TRUST,
21   DROSOULA TSAKOPOULOS, and
     GEORGE TSAKOPOULOS,
22
              Plaintiff-Intervenors,
23
              v.
24
     UNITED STATES FISH AND
25   WILDLIFE SERVICE; H. DALE
     HALL, Director of the United
26   States Fish and Wildlife
     Service; UNITED STATES
27   DEPARTMENT OF INTERIOR; and
     GALE A. NORTON, Secretary of
28   the United States Department

     of Interior,

1          Defendants,

2   and

3   DEFENDERS OF WILDLIFE, BUTTE
    ENVIRONMENTAL COUNCIL, AND
4   CALIFORNIA NATIVE PLANT
    SOCIETY,
5
          Defendant-Intervenors.
6   ─────────────────────────────
7
    BUTTE ENVIRONMENTAL COUNCIL,
8   DEFENDERS OF WILDLIFE,
    CALIFORNIA NATIVE PLANT
9   SOCIETY, SAN JOAQUIN RAPTOR AND
    WILDLIFE RESCUE CENTER, SIERRA
10  FOOTHILLS AUDUBON SOCIETY, and
    VERNALPOOLS.ORG,
11
12          Plaintiffs,

13      v.

14  GALE A. NORTON, Secretary of
    the Interior, and U.S. FISH
15  AND WILDLIFE SERVICE,

16          Defendants.
    ─────────────────────────────
17

18              ----oo0oo----

19          Plaintiffs brought this action pursuant to the

20  Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.; the

21  National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et

22  seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§

23  701 et seq.  Plaintiffs challenge the United States Fish and

24  Wildlife Service's (hereafter "FWS") critical habitat designation

25  of over 800,000 acres of land in California and Oregon for

26  fifteen vernal pool species.  Currently pending before the court

27  are five cross-motions for summary judgment filed by plaintiffs,

28  Home Builders Association of Northern California, et al. ("Home

                                2

1  Builders"); plaintiffs and defendant-intervenors, Butte

2  Environmental Council, et al. ("Environmental Groups");

3  plaintiff-intervenor, the City of Suisun ("Suisun"); plaintiff-

4  intervenors Tsakopoulos Investments, et al. ("Tsakopoulos

5  Investments"); and defendants, the United States Fish and

6  Wildlife Service, H. Dale Hall, and Gale A. Norton ("Federal

7  Defendants").  Defendant-intervenor, Placer Ranch, Inc. ("Placer

8  Ranch") filed an opposition to the Environmental Group's motion

9  for summary judgment.  Also pending before the court is a motion

10 to strike filed by the Federal Defendants.

11 I.   Factual and Procedural History

12          Beginning in 1978 and continuing through 1997, pursuant

13 to the Endangered Species Act, the FWS listed as endangered

14 fifteen species of plants and animals that live in vernal pool

15 environments.[1]  See 43 Fed. Reg. 44,810 (Sept. 28, 1978); 57 Fed.

16 Reg. 24,192 (June 8, 1992); 59 Fed. Reg. 48,136 (Sept. 19, 1994);

17 62 Fed. Reg. 14,338 (Mar. 26, 1997); 62 Fed. Reg. 33,029 (June

18 18, 1997).  The fifteen species are four crustaceans (the

19 Conservancy fairy shrimp, the longhorn fairy shrimp, the vernal

20 pool fairy shrimp, and the vernal pool tadpole shrimp), and

21 eleven plants (the Butte County meadowfoam, Contra Costa

22 goldfields, Hoover's spurge, succulent or fleshy owl's clover,

23 Colusa grass, Greene's tuctoria, hairy Orcutt grass, Sacramento

24

25          [1]   In enacting 16 U.S.C. § 1533 of the Endangered Species
   Act, Congress directed that the Secretary of Commerce shall
26 determine whether species are threatened or endangered species,
   and inform the Secretary of the Interior of such determinations.
27 In turn, the Secretary of Interior shall list species that are
   threatened or endangered and "designate any habitat of such
28 species which is then considered to be critical habitat." 16
   U.S.C. § 1533.

Orcutt grass, San Joaquin Valley Orcutt grass, slender Orcutt grass, and Solano grass).  67 Fed. Reg. 59,884 (Sept. 24, 2002).  These fifteen species are distributed in vernal pool complexes located throughout southern Oregon, parts of California, and parts of northern Mexico.  70 Fed. Reg. 46,925 (Aug. 11, 2005).

A.   The Vernal Pool Habitat

The vernal pool ecosystem in which these species are found is a unique form of wetland that is rendered distinctive by its temporary existence.  67 Fed. Reg. at 59,884.  Vernal pools typically form when precipitation pools above a soil layer that is virtually impermeable to water.  Id. at 59,885.  The pools usually occur in complexes, or clusters, that are fed with water by "low drainage pathways" called swales.  Id.  They are generally found in Mediterranean climates that have dry seasons when evaporation exceeds rainfall, and wet seasons with mild temperatures, during which animals and plants reach maturity and reproduce.  Id.  Vernal pools cycle through four different phases: the wetting phase, when the soil becomes saturated; the aquatic phase, when the pool is filled with water; the water-logged drying phase, when the water begins to evaporate and seep into the surrounding soil, keeping the soil moist; and the dry phase, when the pool has disappeared and the soil becomes completely dry.  Id.  Because the existence of a pool is dependent on rainfall, there are years when vernal pools fill to a lesser or greater extent, and years when they do not fill at all.  Id.  This feature of the ecosystem effectively excludes fish and other predators, and allows species that can survive during the dry phase to flourish in their absence.  Id. at

4

1  59,884.

2       Many of the nutrients on which the vernal pools depend
3  come from detritus, organic matter that washes into the pools
4  through the swales from nearby uplands.  70 Fed. Reg. at 46,925.
5  The four crustacean species consume detritus as one of their
6  primary sources of food.  Id.  The crustacean species inhabiting
7  vernal pools have also adapted to the dry phase of their
8  environment by developing a dormant stage.  Id. at 59,887.  After
9  being fertilized, the eggs develop a thick shell with many
10  layers.  Id.  At a late stage of embryonic development, the
11  embryo stops growing and its metabolism slows dramatically, and
12  the egg becomes known as a "cyst."  Id.  In its desiccated state,
13  a cyst can remain viable for many years and is able to withstand
14  fire, freezing, temperatures near boiling, oxygen deprivation,
15  and exposure to enzymes inside another animal's digestive tract.
16  Id.  It is not clear what signals the cysts to hatch, but not all
17  dormant cysts will hatch in a given season--some cysts will
18  remain dormant, thus protecting against complete reproductive
19  failure if the vernal pool dries up prematurely.  Id. at 59,887.

20       Vernal pool plants are similarly well-adapted to the
21  vernal pool environment.  They are annuals, which means that they
22  germinate, grow, and propagate in the span of a year.  Id. at
23  59,889.  Much like the cysts of the vernal pool crustaceans,
24  vernal pool plants produce seeds that may remain dormant, but
25  still viable, for many years; additionally, there is a "seed
26  bank" of dormant seeds continuously maintained to ensure survival
27  in the event that the aquatic stage of the pool ends prematurely.
28  Id.  Vernal pool plants are able to resist invasion by non-native

plants because of the severe conditions ensure that native plants are uniquely able to survive.  Id. at 59,885.

The physical, geographic, and biological characteristics of vernal pools are somewhat varied, and for this reason, scientists have developed different classifications for vernal pools based on the nature of the underlying soil layer that traps the water and enables the pools to form.  Id. at 59,886 (citation omitted).  Vernal pool habitats are jeopardized by urban development, encroachment upon the water supply, activities to control flooding, and the conversion of land to agricultural use.  Id. at 59,889.

B.   The Critical Habitat Designation

In September, 1994, when the FWS listed four species of fairy shrimp as endangered, it determined that critical habitat designation for the fairy shrimp was "not prudent" because "such designation likely would increase the degree of threat from vandalism or other human activities."  59 Fed. Reg. at 48,151. In February, 2001, this court joined other courts' findings in determining that the FWS' deviation from its statutory mandate to designate critical habitat, concurrently with the listing of a species as endangered, violated the APA.  Butte Envtl. Council v. White, 145 F. Supp. 2d 1180, 1185 (E.D. Cal. 2001).  At that time, this court ordered the defendants to designate critical habitat for the Conservancy fairy shrimp, longhorn fairy shrimp, vernal pool fairy shrimp, and the vernal pool tadpole shrimp, and publish its final designation by August 15, 2001.  Id.  However, on July 23, 2001, the parties stipulated to a one-year extension for the critical habitat designation and the additional

designation of critical habitat for eleven vernal pool plant
species.  Butte Envtl. Council v. Norton, slip op., 04-0096, at 3
(N.D. Cal. Oct. 28, 2004).  The FWS did not comply with this
deadline.  Id.

        The FWS published a proposed rule to designate
1,662,762 acres of critical habitat for the fifteen vernal pool
species on September 24, 2002.  67 Fed. Reg. 59,884.  The
proposed rule excluded land from the critical habitat designation
if the economic benefits of exclusion were found to outweigh the
economic benefits of inclusion, if areas were already under the
supervision of the state (e.g., areas within National Wildlife
Refuges), or if the lands belonged to the Department of Defense
or a Native American tribe.  68 Fed. Reg. at 46,746-54.

        Pursuant to a settlement agreement, the FWS was to
issue a critical habitat designation by July, 2003.  The FWS
issued an "initial" final critical habitat designation on August
6, 2003, that diminished the amount of critical habitat by more
than one million acres.  68 Fed. Reg. 46,684; see Butte Envtl.
Council, No. 04-0096 at 4.  In January, 2004, Environmental
Groups challenged these exclusions from the critical habitat
designation in this court.  Butte Envtl. Council, No. 04-0096, at
4.  The court remanded for reconsideration, but did not set aside
the critical habitat designation in the interim.  Id.  Instead,
the court required that the FWS "reconsider the exclusions from
the final designation of critical habitat for the 15 vernal pool
species, with the exception of those lands within the five
California counties that were excluded based on potential
economic impacts, and publish a new final determination as to

1    those lands within 120 days." Id.  Additionally, the FWS was to

2    "reconsider the exclusion of the five California counties based

3    on potential economic impacts and publish a new final

4    determination no later than July 31, 2005." Id.

5           On December 28, 2004, the FWS published notice that it

6    would reopen the comment period and solicit public comment on the

7    economic and non-economic exclusions of land made in the proposed

8    rule published on September 24, 2002.  69 Fed. Reg. 77,700,

9    77,702-03 (Dec. 28, 2004).  This comment period occurred in two

10   parts--the FWS accepted comments on the non-economic exclusions

11   and on the fifteen vernal pool species first, and then on the

12   economic exclusions. Id. at 77,700.  On March 8, 2005, the FWS

13   confirmed its non-economic exclusion determinations in the

14   August, 2003, final rule.  70 Fed. Reg. 11,140 (Mar. 8, 2005).

15   On June 30, 2005, the FWS published notice of a consulting firm's

16   economic analysis of the critical habitat designation proposed in

17   2002, which concluded that the designation would cost $992

18   million over the next twenty years.  70 Fed. Reg. at 37,739.  The

19   consulting firm also ranked the census tracts based on the

20   opportunity costs that would result if they were designated as

21   critical habitat.  70 Fed. Reg. at 37,740.

22          In its June 30 notice, the FWS noted that it was

23   contemplating the exclusion of either 20, 35, or 50 of the census

24   tracts that would suffer the greatest economic impact.  70 Fed.

25   Reg. at 37,740.  Accordingly, the FWS solicited additional

26   comments on this economic analysis for twenty days. Id. at

27   37,741.  The comment period was abbreviated to ensure compliance

28   with the July 31, 2005, deadline set by this court for a final

8

1  designation.  Id.

2       On August 11, 2005, the FWS published its final rule

3  designating approximately 858,846 acres of critical habitat in 34

4  California counties and one county in southern Oregon.  70 Fed.

5  Reg. 46,924 (Aug. 11, 2005).  This final rule excluded the 20

6  census tracts that would suffer the greatest economic impact,

7  along with three  for which the economic benefits of exclusion

8  outweighed the benefits of inclusion.  Id. at 46,931-32, 46,948-

9  52.  On February 10, 2006, the FWS published an administrative

10 rule that more specifically indicated the species-specific unit

11 descriptions and maps for the protected species.  71 Fed. Reg.

12 7,119 (Feb. 10, 2006).

13 II.  Discussion

14           In their cross-motion for summary judgment, the Federal

15 Defendants argue that the court is divested of jurisdiction over

16 certain claims brought by Home Builders, Tsakopoulos Investments,

17 and Suisun because of a failure to give 60-days notice to the

18 agency of their respective claims.  The Environmental Groups echo

19 these arguments with respect to certain claims brought by

20 plaintiffs Home Builders.  The court will address these arguments

21 first, as it must entertain jurisdictional matters before all

22 others.  Kerr-McGee Chem. Corp. v. U.S. Dep't of Interior, 709

23 F.2d 597, 600 (9th Cir. 1983).

24     A.  Jurisdiction

25         1.  Notice Requirement under the ESA

26       The Endangered Species Act (ESA) authorizes citizen

27 suits under 16 U.S.C. §§ 1531-44.  The section that is relevant

28 here, 1540(g)(2)(A)(i), authorizes citizen suits with the

9

following limitation: "No action may be commenced under
subparagraph (1)(A) of this section . . . prior to sixty days
after written notice of the violation has been given to the
Secretary, and to any alleged violator of any such provision or
regulation . . . ."  Compliance with this provision of the ESA is
a jurisdictional prerequisite to filing suit.  Sw. Ctr. for
Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515,
520 (9th Cir. 1998).  "A failure to strictly comply with the
notice requirement acts as an absolute bar to bringing suit under
the ESA."  Id. (citing Hallstrom v. Tillamook County, 493 U.S.
20, 26-28 (1989); Lone Rock Timber Co. v. U.S. Dept. of Interior,
842 F. Supp. 433, 440 (D. Or. 1994)) (emphasis added).
Accordingly, "[t]he citizen suit notice requirements cannot be
avoided by employing a 'flexible or pragmatic construction.'"
Kern County Farm Bureau v. Badgley, No. 02-5376, 2002 U.S. Dist.
LEXIS 24125, at *20 (E.D. Cal. Oct. 10, 2002) (quoting Hallstrom,
493 U.S. at 26).

         Although claims against the Secretary that do not fall
within the scope of the ESA may be brought under the APA,  5
U.S.C. § 704, this section "authorizes review only when 'there is
no other adequate remedy in a court.'"  Bennett v. Spear, 520
U.S. 154, 173-74, 161-162 (quoting 5 U.S.C § 704).  Thus, if a
claim falls within the scope of the citizen-suit provision, that
is, if it alleges violations of § 1533, the APA is unavailable
and cannot be used to circumvent the ESA's notice requirements.
See Hawaii County Green Party v. Clinton, 124 F. Supp. 2d 1173,
1193 (D. Hawaii 2000) ("Although the APA does not contain the 60
day notice provision, a plaintiff cannot claim that the suit

falls under the APA in order to avoid the notice requirement . .
. . .  A rule that allowed a plaintiff to choose between bringing a
claim under the APA or the ESA would allow plaintiffs to
circumvent the 60 day notice requirements of the ESA.").

2.  Plaintiffs Home Builders

The Federal Defendants contend that the court lacks
jurisdiction over Home Builders' fifth and sixth causes of action
because they failed to give 60 days' notice to the Secretary
about the substance of those claims.  The Environmental Groups
make the same argument with regard to claims one, two, and three.

In November and December, 2004, plaintiffs Home
Builders sent Federal Defendants notice of their intent to
challenge the August, 2003 Final Rule.  (Doc. # 31, Ex. 1 & 2
(Home Builders' Notice to FWS).)  Home Builders listed six legal
challenges, including two challenges that are relevant here--
namely, that Federal Defendants failed to conduct the required
exclusion analysis in violation of § 1533(b)(2) and failed to
adequately evaluate the economic impact of designating critical
habitat, also in violation of § 1533(b)(2).  (See id., Ex. 1 at
6.)  Subsequently, Federal Defendants reopened the public comment
period with respect to the economic analysis and the exclusions
in the August, 2003 Final Rule, prompted by an order from this
court.  In August, 2005, Federal Defendants published the 2005
Final Rule designating critical habitat.

Upon review of the record, it is apparent that the 2005
Final Rule is a hybrid of new analysis and previous analysis
taken from the 2003 Rule.  The record reflects that the 2003 Rule
was adapted and revised after the Federal Defendants reexamined

11

the exclusions and economic impact.  See 70 Fed. Reg. 46,924
(Aug. 11, 2005) ("We, the [FWS], have re-evaluated the economic
analysis made in our previous final rule . . . ."); 70 Fed. Reg.
11,140 (Mar. 8, 2005) ("We, the [FWS], confirm the non-economic
exclusions made to our previous final rule . . . .").

        For the reasons discussed below, the court concludes
that Home Builders' notice was sufficient.  Home Builders' notice
specifically alleged that Federal Defendants failed to make
proper exclusions and failed to appropriately analyze the
economic impact of the designation.  Home Builders subsequently
filed suit alleging a claim for failure to adequately evaluate
economic impacts of the critical habitat designation (claim five)
and a claim for failure to properly conduct the mandatory
exclusion analysis (claim six).  (See Pls. Home Builders' First
Am. Compl. ¶ 13.)  A simple comparison between the allegations in
the notice and the allegations in the complaint reveal that the
Federal Defendants had notice of Home Builders' intentions.[2]

        As discussed previously, the purpose of the notice
requirement is to give the federal government an opportunity to
comply with the allegations, thereby rendering a citizen suit
unnecessary.  Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072
(9th Cir. 1996).  Implicit in the notice provision is that,
should the Federal agency not comply or rectify the violation,
the citizen will bring suit.  That is exactly what happened here:

_____

        [2]    Although Home Builders' sixth claim for relief alleges
that Federal Defendants improperly limited their exclusion
analysis to twenty-three of the most affected census tracts,
which plaintiffs admit was not expressly noticed, plaintiffs'
noticed arguments regarding the FWS' approach to cost-benefit
analysis apply with equal force to this claim.

Federal Defendants failed to rectify the alleged violations in a manner satisfactory to Home Builders.  It does not follow, however, that Home Builders must now file a new notice of intent to sue.

For the purposes of the notice requirement, it is sufficient that Home Builders gave Federal Defendants notice of the issues they would pursue in litigation and subsequently filed suit on those exact issues.  There is certainly no statutory language in the ESA citizen-suit provisions that requires a citizen to renew their notice each and every time the FWS reevaluates its previous rule.  In <u>Marbled Murrelet</u>, plaintiff filed a notice that did not clearly delineate which section of the ESA the defendant allegedly violated.  The court determined that although the relevant section of the statute was "referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations[, and t]his was sufficient to satisfy the jurisdictional requirement of notice."  <u>Id.</u> at 1074. Additionally, in relation to the Clean Water Act, which has a 60-day notice provision that is similar to the ESA, the Ninth Circuit has held that a notice given before the rule it challenged was amended, which substantially provided the agency with the requisite notice, did not need to be re-filed.  <u>Natural Resources Def. Council v. Sw. Marine, Inc.</u>, 236 F.3d 985, 996 (9th Cir. 2000).

Similarly, Home Builders' letter to Federal Defendants "as a whole provided notice sufficient to afford" Federal Defendants the opportunity to rectify the violations.  The fact

13

1   that Federal Defendants attempted to respond to the allegations
2   to some degree does not mean that Home Builders must refile a
3   notice to sue.  See <u>Water Keeper Alliance v. U.S. Dept. of</u>
4   <u>Defense</u>, 152 F. Supp. 2d 163, 174 (1st Cir. 2001) (concluding
5   that an environmental group's notice of intent to sue Department
6   of Defense under the ESA regarding a biological opinion was
7   adequate notice, even where a new biological assessment was
8   issued in the interim--the notice made clear that group intended
9   to challenge an ongoing delinquency in the preparation of a
10  biological assessment).

11        <u>Southwest Center for Biological Diversity v. U.S.</u>
12  <u>Bureau of Reclamation</u>, on which Federal Defendants rely, is
13  distinguishable.  143 F.3d 515, 521 (9th Cir. 1998).  There, the
14  court concluded that none of plaintiff's notice letters informed
15  the Service that plaintiff had a grievance about the specific
16  habitat at issue in the litigation.  The court found that, as a
17  result of this deficiency, "neither party was able to resolve
18  that particular grievance in the litigation-free window provided
19  for under the ESA notice provision."  <u>Id.</u>  The court explained
20  that the plaintiff "was obligated to provide sufficient
21  information of a violation so that the [FWS] could identify and
22  attempt to abate the violation."  <u>Id.</u>

23        Likewise, <u>Moden v. U.S. Fish & Wildlife Service</u> does
24  not support Federal Defendants' contention that Home Builders did
25  not provide defendants with sufficient notice.  281 F.
26  Supp. 2d 1193, 1206 (D. Or. 2003).  In <u>Moden</u>, the plaintiffs'
27  initial notice charged the agency with a duty to remove certain
28  endangered species from the list.  <u>Id.</u> at 1205.  However, the

1  agency had not considered, let alone rejected, the petition to

2  delist the species, so the plaintiffs' notice that it would sue

3  the agency for committing an unlawful action was premature.  <u>Id.</u>

4  at 1206.  Finally, Federal Defendants cite a decision by Judge

5  Ishii that is expressly distinguishable from this case.  In <u>Kern</u>

6  <u>County Farm Bureau v. Badgley</u>, the plaintiff filed notice of its

7  intent to sue the agency for a final rule regarding the listing

8  of an endangered species before the agency's final rule issued.

9  No. 02-5376, 2002 U.S. Dist. LEXIS 24125, at *35-36 (E.D. Cal.

10  Oct. 10, 2002).  Distinguishing <u>Natural Resources Defense</u>

11  <u>Council</u>, Judge Ishii indicated that "[t]his is not a case in

12  which the Secretary submitted two final rules--one before the

13  notice letter was sent and one afterwards."  <u>Id.</u> at *36.

14        Here, Home Builders filed its notice with regard to a

15  final rule promulgated by the agency, and the final rule was

16  amended after the notice was filed.  Home Builders' notice

17  clearly informed the Federal Defendants of the very allegations

18  Home Builders planned to raise, and subsequently did raise, in

19  the instant litigation.  The fact that the parties' use of the

20  "litigation-free" window failed to resolve Home Builders

21  allegations does not render Home Builders' notice moot.  Rather,

22  it merely signifies that the parties failed to reach an agreement

23  to resolve the dispute.  For these reasons, the court concludes

24  that Home Builders complied with the notice requirement, and this

25  court therefore has jurisdiction over the claims in their

26  complaint.

27              3.   <u>Plaintiff-Intervenors Tsakopoulos Investments</u>

28        The Federal Defendants further argue that Tsakopoulos

15

Investments did not provide the FWS with notice of its claims 60 days before bringing suit, as required under the ESA. Tsakopoulos Investments sent notice to the FWS on March 6, 2006. (Kate O'Leary Decl. Ex. 4 (Formal Petition to the FWS) (Doc. #68).)  Tsakopoulos Investments filed suit and moved to intervene in the case on March 14, 2006, only eight days after providing the Secretary with notice.  Tsakopoulos Invs. v. Allen, slip op., No. 06-542 (E.D. Cal. Mar. 14, 2006); (Mar. 14, 2006 Mot. to Intervene as Pls.).

Tsakopoulos Investments maintains that its claims were brought pursuant to the APA and not the ESA because the "ESA does not provide a cause of action in situations like this, where the Fish and Wildlife Service has executed its mandatory duty to designate critical habitat, but has done so in an arbitrary and capricious manner."  (Tsakopoulos' Reply 3:12-25.)  In making this argument, Tsakopoulos Investments incorrectly contends that it can avoid the ESA's notice requirement by manipulating the nature of claims that arise under the ESA.  See Hawaii County Green Party, 124 F. Supp. 2d at 1193 (D. Hawaii 2000) (concluding that "a particular claim may only be brought under either the APA or the ESA--a plaintiff may not chose her statutory weapon").

Tsakopoulos Investments further misconstrues what constitutes a "non-discretionary decision."  Contrary to Tsakopoulos Investments' contentions, the terms of § 1533 are "plainly those of obligation rather than discretion."  Assoc. of Cal. Water Agencies ("ACWA") v. Evans, 386 F.3d 879, 883 (9th Cir. 2004).  Among other things, the statute states that the "Secretary shall designate critical habitat . . . on the basis of

16

the best scientific data available and after taking into
consideration the economic impact. . . ." § 1533(b)(2) (emphasis
added).  In other words, § 1533 sets out required considerations
for the determination of critical habitat and the section is
crafted in mandatory language.

     In <u>Bennett v. Spear</u>, the Supreme Court confirmed that
the citizen suit provisions of the ESA apply to allegations that
the Service ignored requisite considerations set forth by § 1533.
520 U.S. at 171-72.  As in this case, the plaintiffs in <u>Bennett</u>
challenged an FWS decision on the basis that defendants had
failed to take into account the possible economic impact of the
decision, as specifically required by § 1533.  In <u>Bennett</u>, the
government argued that the citizen suit provision did <u>not</u> apply
to the failure to consider economic impact.  The court rejected
that argument and confirmed that § 1533 sets forth mandatory,
non-discretionary requirements, that terms stating that the
Secretary "shall" take specific action "are plainly those of
obligation rather than discretion," and that claims alleging
failure to comply with such a mandate come within §
1540(g)(1)(C).  <u>Id.</u>

     Similarly, plaintiffs' allegations here invoke the
requirements of § 1533.  Indeed, a plain reading of Tsakopoulos
Investments' complaint reveals allegations of the Federal
Defendants' failure to take specific actions that are "plainly
those of obligation rather than discretion."  <u>Id.</u>  As the Federal
Defendants point out, Tsakopoulos Investments' third cause of
action is almost identical to the issue presented in <u>ACWA</u>, in
which the Ninth Circuit concluded that the claim fell squarely

17

within the scope of the citizen suit provision.   386 F.3d at 884.
The Ninth Circuit concluded that the failure to conduct an
economic review pursuant to § 1533 (b)(2) was a claim governed by
the citizen suit provision of the ESA.  See id.  Tsakopoulos
Investments' third cause of action alleges that Federal
Defendants violated the ESA by failing to adequately evaluate the
economic impact of designating critical habitat in violation of §
1533(b)(2).   Thus, like the plaintiffs in ACWA, Tsakopoulos
Investments' third claim seeks to enforce mandatory duties
imposed by the ESA, and this claim is therefore subject to the
notice requirement.

        The remainder of the claims in Tsakopoulos Investments'
complaint similarly refer to mandatory duties that the FWS must
perform under the ESA.  Tsakopoulos Investments' first claim
alleges that the Federal Defendants failed to adequately identify
physical or biological features essential to conservation, as
required by the ESA; the second claim also alleges that the
Federal Defendants failed to identify the geographic areas
identified by the species, as required by the ESA; the third
claim is for the failure to comply with the ESA's direction that
"the Secretary shall designate critical habitat . . . after
taking into consideration the economic impact, the impact on
national security, and any other relevant impact;" the fourth
claim relates to the FWS' failure to consider the best available
scientific and commercial data as required by the ESA; the fifth
claim relates to the failure to conduct the mandatory exclusion
analysis; and the sixth and seventh claims allege that the FWS
failed to adequately comply with the notice and comment

requirement as <u>required</u> by the APA and the ESA.[3]   (<u>Id.</u>)   Thus, the court concludes that the notice requirement applies to the claims in Tsakopoulos Investments' complaint.

Tsakopoulos Investments additionally argues that the

---

[3]   In its seventh cause of action, Tsakopoulos Investments does not clarify what statutory provision was violated by the FWS's failure to adequately respond to public comments, but it alleges it arises under the APA.   This claim could relate to the failure to provide a meaningful notice and comment period and to the economic exclusion analysis, both of which are mandatory duties under the ESA that are subject to the notice requirement. However, because the statutory basis for the claim is somewhat unclear, it may be that this claim alone is not subject to the ESA's notice requirement, and therefore may not be jurisdictionally foreclosed.   Even if Tsakopoulos Investments is not barred from alleging the seventh claim in its complaint, however, the claim is meritless.   In this claim, Tsakopoulos Investments alleges that,

> Defendants failed to adequately respond to significant comments, in violation of the APA.   Defendants received Blueprint growth projections to 2025 by census tract for Sacramento County, but declined to use these growth figures in the August 2005 Final Rule. This failure to comply with the APA constitutes agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

(Compl. ¶¶ 67-68.)   Tsakopoulos Investments is referring to a "vision" developed by the Sacramento Area Council of Government ("SACOG") regarding growth in Sacramento County over the next fifty years, called a "Preferred Blueprint Alternative."   (Admin. R. Vol. 2, Doc. # 291, at 17021719.)

The FWS received this comment and considered it, but ultimately rejected it as lacking merit.   70 Fed. Reg. at 46,931. The economic analysis the FWS commissioned was a twenty-year analysis, not a fifty-year analysis like the Blueprint. Therefore, it would have been difficult to integrate the Blueprint's analysis into the existing analysis the FWS conducted.   Additionally, SACOG indicated that the Blueprint was not in a form where it could be considered "likely to occur" (Admin. R. Vol. 2, Doc. # 291, at 17021707), and it was only a version that would be prepared in the year 2030 that would "represent the land use pattern that is most likely to be built in the region."   (<u>Id.</u> at 17021707, 17, 19.)   For these reasons, even if the court had jurisdiction over this claim, it would conclude that the FWS's decision to disregard the Blueprint was not arbitrary or capricious.

Federal Defendants contradict themselves by contending on the one hand that the mandatory nature of their critical habitat designation subjects Tsakopoulos Investments' claims to the ESA's notice requirement, and on the other hand that this court should review the agency decision under a discretionary standard.  The Supreme Court has rejected this very argument, explaining that:

> [T]he fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical requirement that, in arriving at his decision, he "take into consideration the economic impact, any other relevant impact" and "use the best scientific data available."  It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.

Bennett, 520 U.S. at 172.

The court further finds persuasive that on March 6, 2006, Tsakopoulos Investments sent Federal Defendants a letter in which it stated, "[t]his letter also constitutes our 60-Day Notice of Violation in accordance with 16 U.S.C. § 1540 (g)(2)(A) and (c)."  In this letter, Tsakopoulos Investments appears to admit that the 60-day notice applied to its complaint and that it was in fact bringing suit pursuant to the citizen suit provision of the ESA.  Yet, despite the apparent admission in this letter, Tsakopoulos Investments filed its complaint only eight days later.

Finally, this conclusion is in keeping with the very purpose of the citizen-suit provision, which is to give defendants an "opportunity to review their actions and take corrective measures if warranted.  The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation."  Southwest Center, 143 F.3d at 520.

For these reasons, the court concludes that it lacks jurisdiction over all causes of action alleged by Tsakopoulos Investments and cannot consider their merits.

### 4.   Plaintiff-Intervenor City of Suisun

The Federal Defendants also contend that the court lacks jurisdiction over Plaintiff-Intervenor City of Suisun's claims.  On March 3, 2006, the court permitted intervention by the City but restricted the City's involvement "to raising arguments which relate to the issues concerning the species which are on the 88-acre parcel of land that is within the sphere of influence and the area designated as critical habitat."  (Mar. 3, 2006 Order 5-6.)  Plaintiff-intervenor City of Suisun alleges eight claims for relief, the first seven of which refer to mandatory duties for the FWS under 16 U.S.C. § 1533(a)(3) & (b)(2).  As previously discussed, under the ESA, "any person may commence a civil suit on his own behalf" beginning "sixty days after written notice of the violation has been given to the Secretary."  16 U.S.C. § 1540(g)(1) (emphasis added).  The United States Supreme Court has established that this notice requirement is a mandatory condition precedent for suit, and that the requirement is to be "strictly construed."  See Hallstrom, 493 U.S. at 26.

There is no indication that the City provided the Secretary with the requisite 60-day notice.  Instead, the City alleges that "[p]laintiffs Home Builders Association et al. timely provided Defendants written notice of violation in accordance with 16 U.S.C. § 1540(g)(2)(C).  The claims in the City's instant action were all raised by Plaintiffs Home Builders

Association et al.'s notice of violation and amendment thereto."
(Compl. ¶ 3.)[4]  Additionally, allowing Home Builders' notice to
suffice as joint notice for the City of Suisun's claims would
frustrate one of the primary purposes of the notice requirement--
"the facilitation of a negotiated resolution."  Idaho Sporting
Congress, 952 F. Supp. 690, 695 (D. Idaho 1996).  Finally, the
court's order limiting the scope of the City's claims expressly
provided that the claims only cover an 88-acre parcel land owned
by the City and designated as critical habitat.  There is no
reference to this land in plaintiffs Home Builders' notice (see
Home Builders' Compl. Ex. 2), and therefore, even assuming that
notice by proxy is permissible, Home Builders' notice would not
suffice to provide the Secretary with notice of the City's
claims.

Like the court in Kern County, this court is aware that
"a strict construction of the 60-day notice requirement may
appear to be inequitable and a waste of judicial resources."
2002 U.S. Dist. LEXIS 24125, at *22 (citing Hallstrom, 493 U.S.
at 32; Washington Trout v. McCain Foods, Inc., 45 F.3d 1351,
1354-55 (9th Cir. 1995)).  Yet, it is inescapable that, in this
situation, courts "lack authority to consider the equities."  Id.
Additionally, if this court exercised jurisdiction over claims
that had not been properly disclosed to and noticed before the
agency, the court "would usurp the right of the applicable
governmental agencies to evaluate and act upon the merits of the

---

[4]     Because the City additionally has joined in plaintiffs
Home Builders' motion for summary judgment, rather than filing
its own motion for summary judgment, there are no arguments
before the court on the City's behalf.

claims prior to judicial review." <u>ONRC Action v. Columbia Plywood, Inc.</u>, 286 F.3d 1137, 1144 (9th Cir. 2002).  For these reasons, the court does not have jurisdiction to reach the merits of the arguments made by the City of Suisun in its first seven claims.[5]

    B.   <u>Federal Defendants' Motion to Strike</u>

      The Federal Defendants move to strike extra-record evidence proffered by Tsakopoulos Investments and the Environmental Groups.  In the Ninth Circuit, materials not present in the administrative record may be considered by a court reviewing an agency decision in only four situations: (1) when they are "necessary to determine whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith." <u>Sw. Ctr. for Biological Diversity v. U.S. Forest Service</u>, 100 F.3d 1443, 1450 (9th Cir. 1996) (internal quotations omitted).  Additionally, where specific facts must be presented in the form of affidavits or other evidence to establish standing, the court will take these facts to be true for the purposes of a summary judgment motion.  <u>See Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992); <u>see also Nw. Envt'l Def. Ctr. v. Bonneville Power Admin.</u>, 117 F.3d 1520, 1528 (9th Cir. 1997) (considering extra-record

---

    [5]    The only remaining claim by the City of Suisun is that the critical habitat designation is void because of the FWS's failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370.

1  affidavits for the purpose of determining whether the plaintiffs
2  had standing to sue).

3        The court has not considered the documents submitted by
4  Tsakopoulos Investments, as they were immaterial to the
5  jurisdictional issues that prevented the court from reviewing
6  Tsakopoulos Investments' first six claims, and also immaterial to
7  the seventh claim.  Therefore, the motion to strike is
8  unnecessary as to those documents.

9        Additionally, the Environmental Groups submitted extra-
10 record declarations in order to establish standing.  To the
11 extent that the declarations could be used in support of other
12 arguments, the court has not relied upon them, and the
13 Environmental Groups have indicated that they do not intend the
14 declarations be used for any other purpose.  Therefore, the court
15 declines to strike these declarations.

16       Federal Defendants also move to strike (1) the study,
17 "Report: Initial Assessment of Habitat Characteristics and
18 Conservation Potential in Western Placer County," which is
19 attached as Exhibit 3 to the Delfino Declaration, and (2)
20 portions of the Delfino Declaration that refer to this study and
21 lines of the environmental groups' summary judgment brief that
22 discuss it.  The Environmental Groups contend that consideration
23 of this study is "necessary to determine whether the agency has
24 considered all relevant factors and has explained its decision,"
25 because it demonstrates that the FWS has failed to consider the
26 economic benefits of designating critical habitat.  The court
27 will therefore consider this extra-record evidence.

28       The parties also dispute whether the court can consider

24

1  an article entitled "Habitat Cave-In?," which addresses an

2  attempt by Riverside County to develop protected land and notes

3  the effect of political considerations on a habitat conservation

4  plan.  The court is not persuaded that an article published in

5  the Riverside Press-Enterprise is "necessary" to demonstrate that

6  FWS considered all relevant factors when it appears to be

7  irrelevant.  Therefore, the court will strike this extra-record

8  evidence that is attached to the Environmental Groups' motion for

9  summary judgment as Exhibit 4.

10        Finally, Federal Defendants move to strike the second

11  exhibit to the Delfino Declaration, a settlement agreement that

12  resulted in the Placer County Report, and the accompanying

13  discussion of the circumstances that led to settlement agreement.

14  "Federal courts may 'take notice of proceedings in other courts,

15  both within and without the federal judicial system, if those

16  proceedings have a direct relation to the matters at issue.'"

17  Cactus Corner, LLC v. U.S. Dept. of Agriculture, 346 F. Supp. 2d

18  1075, 1092 (E.D. Cal. 2004) (quoting United States ex rel

19  Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d

20  244, 248 (9th Cir. 1992)).  It is unclear whether a settlement

21  can be considered a proceeding, and it is additionally unclear

22  that this settlement has a direct relation to the proceedings

23  here.  Therefore, the court will not take judicial notice of the

24  settlement agreement.  The court therefore grants Federal

25  Defendants' motion to strike this report and the related

26  discussion beginning on page 16 at line 20 of the Environmental

27  Groups' motion for summary judgment and continuing through page

28  17, line 3.

1       C.   Summary Judgment

2              Summary judgment is proper "if the pleadings,

3       depositions, answers to interrogatories, and admissions on file,

4       together with the affidavits, if any, show that there is no

5       genuine issue as to any material fact and that the moving party

6       is entitled to judgment as a matter of law."  Fed. R. Civ. P.

7       56(c).  A material fact is one that could affect the outcome of

8       the suit, and a genuine issue is one that could permit a

9       reasonable jury to enter a verdict in the non-moving party's

10      favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

11      (1986).  The party moving for summary judgment bears the initial

12      burden of establishing the absence of a genuine issue of material

13      fact, and can satisfy this burden by presenting evidence that

14      negates an essential element of the non-moving party's case.

15      Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

16      Alternatively, the movant can demonstrate that the non-moving

17      party cannot provide evidence to support an essential element

18      upon which it will bear the burden of proof at trial.   Id.

19           1.   Administrative Procedure Act

20              Judicial review of actions by administrative agencies

21      is generally governed by the Administrative Procedure Act, 5

22      U.S.C. § 706(2)(A), which states that a reviewing court must set

23      aside agency actions found to be "arbitrary, capricious, an abuse

24      of discretion, or otherwise not in accordance with the law."  See

25      Wetlands Action Network v. United States Army Corps of Eng'rs,

26      222 F.3d 1105, 1114 (9th Cir. 2000).

27              This is a "deferential standard . . . designed to

28      ensure that the agency considered all of the relevant factors and

1  that its decision contained no clear error of judgment." <u>Pac.</u>

2  <u>Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries</u>

3  <u>Serv.</u>, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations

4  omitted).  An agency action should only be overturned when the

5  agency "has relied on factors which Congress has not intended it

6  to consider, entirely failed to consider an important aspect of

7  the problem, offered an explanation for its decision that runs

8  counter to the evidence before the agency, or is so implausible

9  that it could not be ascribed to a difference in view or the

10  product of agency expertise." <u>Id.</u> (quoting <u>Motor Vehicle Mfrs.</u>

11  <u>Ass'n v. State Farm Mutual Auto. Ins. Co.</u>, 463 U.S. 29, 43

12  (1983)).  The court must ask whether the agency considered "the

13  relevant factors and articulated a rational connection between

14  the facts found and the choice made." <u>Natural Res. Def. Council</u>

15  <u>v. United States Dep't of the Interior</u>, 113 F.3d 1121, 1124 (9th

16  Cir. 1997).

17          The court is not empowered to substitute its judgment

18  for that of the agency. <u>Az. Cattle Growers' Ass'n v. U.S. Fish &</u>

19  <u>Wildlife Serv.</u>, 273 F.3d 1229, 1236 (9th Cir. 2001) (citing

20  <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402,

21  416 (1971)).  Moreover, the court should review the agency's

22  actions based on the administrative record presented by the

23  agency. <u>See</u> <u>Center for Biological Diversity v. U.S. Fish &</u>

24  <u>Wildlife Serv.</u>, 450 F.3d 930, 943 (9th Cir. 2006) ("When

25  reviewing an agency decision, the focal point for judicial review

26  should be the administrative record already in existence, not

27  some new record made initially in the reviewing court.")

28  (internal quotations and citations omitted).

1          2.   Endangered Species Act

2          The FWS is subject to additional regulations when it

3 lists a species as threatened or endangered.  Under § 4(a) of the

4 Endangered Species Act ("ESA"), when the FWS lists a species, "to

5 the maximum extent prudent and determinable," it must also

6 designate a critical habitat for that species.  16 U.S.C. §

7 1533(a)(3).  "Critical habitat" refers to geographic areas that

8 are "essential" for the conservation of the species.  16 U.S.C. §

9 1532(5)(A).  Land is considered critical habitat when it is "a

10 specific area within the geographical area occupied by the

11 species" that has physical and biological features essential to

12 conservation and that "may require special management

13 considerations of protection."  Id.  Specific areas outside of

14 the geographical area occupied the species may also be designated

15 as critical habitat if the Secretary determines they are

16 "essential for the conservation of the species."  Id.  In other

17 words, critical habitat is land essential to the conservation of

18 the species, but it includes the habitat occupied by the species

19 as well as land on which the species cannot be found, provided

20 the Secretary determines that land unoccupied by the species is

21 nevertheless necessary for its conservation.

22         Pursuant to § 4(b)(2) of the ESA, the FWS must

23 designate critical habitat based on the "best scientific data

24 available and after taking into consideration the economic

25 impact, and any other relevant impact, of specifying any

26 particular area as critical habitat."  16 U.S.C. § 1533(b)(2)

27 (emphasis added).  The FWS may exclude an area from critical

28 habitat when it "determines that the benefits of such exclusion

outweigh the benefits of specifying such areas as part of the
critical habitat," provided exclusion will not result in the
extinction of the species.  Id. § 1533(b)(2).  The FWS is
prohibited from designating lands owned by the Department of
Defense and subject to an integrated natural resources management
plan "if the Secretary determines in writing that such a plan
provides a benefit to the species.  Id. § 1533(a)(3)(B)(i).  The
FWS must publish regulations in the Federal Register regarding
its critical habitat designation after a notice and comment
period.  Id. § 1533(a)(3)(A).  A court reviewing the FWS's
actions taken pursuant to the ESA must ask whether the agency
considered "the relevant factors and articulated a rational
connection between the facts found and the choice made."  Natural
Res. Def. Council v. U.S. Dep't of the Interior, 113 F.3d 1121,
1124 (9th Cir. 1997).

        3.  Home Builders' Motion for Summary Judgment

              Home Builders argue that, in making the critical
habitat designation, the FWS: (1) failed to describe the specific
areas occupied by the species within the subunits designated as
critical habitat, (2) improperly included structures and other
developed areas that do not contain the primary constituent
elements (PCEs) essential to conservation of the fifteen species,
(3) inadequately described the species' PCEs, and (4) conducted
economic impact analysis without considering coextensive or
cumulative impacts or explaining why certain tracts were excluded
and others were included.  Home Builders contends that these
actions constitute violations of the ESA, the APA, and the NEPA,
and that the critical impact designation should therefore be set

1  aside.

2           a.   Failure to Distinguish Unoccupied Habitat

3           Home Builders argue that the FWS did not distinguish

4  between unoccupied and occupied habitat as required under the

5  ESA.  As noted above, there are different standards for critical

6  habitat designation of occupied areas than for designation of

7  unoccupied areas.  In short, there is a higher standard for

8  critical habitat designation of areas unoccupied by the species--

9  the Secretary must make a determination that such areas are

10  essential to the conservation of the species.  16 U.S.C. §

11  1532(A)(ii).

12          Although the FWS determined that each of the critical

13  habitat units is occupied by the species, it admittedly included

14  some unoccupied subsections within the critical habitat units.

15  (Fed. Defs.' Cross-Mot. for Summ. J. 19 (citing 70 Fed. Reg. at

16  46,945; 68 Fed. Reg. at 46,721, 46,722-44).)  The FWS recognized

17  that some unoccupied areas were likely to have been included,

18  defining the term "unoccupied" as "an area that contains no

19  hatched vernal pool crustaceans or observed above-ground plants,

20  and that is unlikely to contain a viable cyst or seed bank."  70

21  Fed. Reg. 46,924, 46,929; 68 Fed. Reg. at 46,715.

22          The FWS points out that it is difficult to distinguish

23  between occupied and unoccupied areas due to the nature of vernal

24  pools.  Vernal pools are ephemeral in nature, and vernal pool

25  species are characterized by their ability to remain in a dormant

26  phase for years at a time.  The size of a vernal pool also

27  fluctuates from year to year, and in some years, the pool itself

28  may never form.  As previously discussed, vernal pools exist in

clusters that are fed with water by "low drainage pathways" called swales.  Thus, the FWS concluded it "cannot quantify in any meaningful way what proportion of each critical habitat unit may actually be occupied by the vernal pool crustaceans or vernal pool plants at any one time," and had likely included some unoccupied areas for that reason.  Id.

     The FWS's duty under the ESA is to make a critical habitat designation "on the basis of the best scientific data available."  Id. § 1333(b)(2) (emphasis added).  Accordingly, the FWS need not conduct its own studies to improve upon existing scientific data.  Sw. Center for Biological Diversity v. Babbit, 215 F.3d 58, 60-61 (D.C. Cir. 2000); see also Building Indus. Ass'n v. Norton, 247 F.3d 1241, 1246 (D.C. Cir. 2001) ("the Service must utilize the 'best scientific . . . data available,' not the best scientific data possible" (quoting § 1533(b)(1)(A))).  Moreover, the FWS was required to publish its critical habitat designation concurrently with the regulation listing the species as threatened or endangered, or, if critical habitat was not determinable at the time of listing, no later than a year after the listing of the species.  16 U.S.C. § 1533(b)(6)(C)(ii).  Even if the FWS delays its critical habitat designation for a year, the designation should then be made "based on such data as may be available at that time."  Id. Moreover, "[t]he designation of critical habitat is to coincide with the final listing decision absent extraordinary circumstances."  Natural Res. Def. Council v. U.S. Dept. of the Interior, 113 F.3d 1121, 1126 (9th Cir. 1997) (quoting N. Spotted Owl v. Lujan, 758 F.Supp. 621, 626 (W.D. Wash. 1991)).  Thus,

because of the statutory constraints the FWS faced and the unique characteristics of vernal pools and the species that inhabit them, the FWS appropriately made its critical habitat designation in a manner consistent with the scientific evidence available.

The significance of Home Builders' argument is that the FWS may not have properly designated habitat because it did not precisely follow the statutory definition.  However, the distinction between the two types of habitat is that unoccupied habitat must be more carefully designated.  <u>Cape Hatteras Access Pres. Alliance v. U.S. DOI</u>, 344 F. Supp. 2d 108, 119 (D.D.C. 2004) ("[B]oth occupied and unoccupied areas may become critical habitat, but, with unoccupied areas, it is not enough that the area's features be essential to conservation, the area itself must be essential.").  Given the difficulty in determining whether a particular habitat is occupied or unoccupied by a vernal pool species, the FWS reasonably determined whether habitat was critical according to the more exacting of the two standards.

Moreover, there is theoretically no limit to the degree of precision agencies could be compelled to undergo before designating critical habitat under Home Builders' argument. Within a critical habitat unit, it is entirely possible that a single square inch of the land at issue would be wholly unoccupied by the relevant species.  Clearly, an agency should not have to make a critical habitat determination on such a fine scale, but the logical extension of Home Builders' argument would seem to impose just such a requirement on the agency.  Therefore, the critical habitat designation will pass muster regardless of

32

whether the habitat designated was occupied or unoccupied.[6]   The
court will defer to the agency's reasonable judgment on this
issue, and finds that the fact that the FWS did not expressly
delineate which portions of the habitat were occupied and which
portions were unoccupied does not constitute a violation of the
ESA.

> b.   Failure to Adequately Identify PCEs

For occupied critical habitats, the FWS is required to
identify "physical or biological features essential to the
conservation of the species," that "may require special
management considerations or protection."  16 U.S.C. §
1532(5)(A)(i).  In FWS regulations, the "physical and biological
features" are also referred to as "primary constituent elements"
or "PCEs" of the critical habitat.  50 C.F.R. § 424.12(b)(5).
Home Builders argue that the PCEs identified by the FWS are
inadequate and are not described with sufficient particularity.

The PCEs listed by the FWS for the Conservancy fairy
shrimp in its August, 2005 final rule are:

---

[6]   Home Builders argue that at some points the FWS
described critical habitat units as "important," "unique," or
"unusual," instead of as "essential."  (Home Builders' Mot. for
Summ. J. 25.)  However, the FWS' variation in word choice does
not change the fact that the FWS did determine that each of the
critical habitat units was essential to the conservation of the
species.  See 68 Fed. Reg. at 46,715-16 ("[W]e determined that
all currently known extant occurrences of the 11 vernal pool
plants and 2 of the 4 vernal pool crustaceans (Conservancy fairy
shrimp and longhorn fairy shrimp) are essential to the
conservation of the species, due to their limited geographic and
ecological distributions (criteria 1 and 2), low overall number
of populations (criterion 1), and the seriousness of the threats
posed to remaining populations, including fragmentation of
habitat.  For the other two vernal pool crustaceans (vernal pool
fairy shrimp and vernal pool tadpole shrimp), we were able to
meet the criteria listed above without designating all occupied
areas . . . " (emphasis added)).

(i) Topographic features characterized by mounds and swales, and depressions within a matrix of surrounding uplands that result in complexes of continuously, or intermittently, flowing surface water in the swales connecting the pools described in PCE (ii), providing for dispersal and promoting hydroperiods of adequate length in the pools.

(ii) Depressional features including isolated vernal pools with underlying restrictive soil layers that become inundated during winter rains and that continuously hold water for a minimum of 19 days (Helm 1998), in all but the driest years; thereby providing adequate water for incubation, maturation, and reproduction. As these features are inundated on a seasonal basis, they do not promote the development of obligate wetland vegetation habitats typical of permanently flooded emergent wetlands.

(iii) Sources of food, expected to be detritus occurring in the pools, contributed by overland flow from the pools' watershed, or the results of biological processes within the pools themselves, such as single-celled bacteria, algae, and dead organic matter, to provide for feeding.

(iv) Structure within the pools described in PCE (ii), consisting of organic and inorganic materials, such as living and dead plants from plant species adapted to seasonally inundated environments, rocks, and other inorganic debris that may be washed, blown, or otherwise transported into the pools, that provide shelter.

70 Fed. Reg. at 46,934-35.  The only difference between this PCE and the PCEs of the remaining three vernal pool crustaceans is the minimum number of days the vernal pool must be filled with water in all but the driest years, as described in section (ii). Id. at 46,934-37.  The PCEs for the eleven plants are similar to sections (i) and (ii) above, and are identical to each other. Id. at 46,937-42.  According to the relevant federal regulations, "[p]rimary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites,

34

feeding sites, seasonal wetland or dryland, water quality or
quantity, host species or plant pollinator, geological formation,
vegetation type, tide, and specific soil types." 50 C.F.R. §
424.12.  The PCEs chosen by the FWS describe the seasonal
character of the pools, the shelter they provide for crustacean
species, their underlying soil and the manner of formation, and
also note that the pools themselves are sites where the species
feed, reproduce, and mature.

Home Builders argue that the identification of a
"matrix of surrounding uplands" necessary for the periodic flow
of water into the pools is not sufficiently specific.[7]  In

---

[7]    Home Builders additionally contend that the FWS's
definitions would allow land with only one PCE to be designated
as critical habitat, citing the following language in the August,
2005 Final Rule: "PCEs described for each species do not have to
occur simultaneously within a unit for the unit to constitute
critical habitat for any of the 15 vernal pool species."  Home
Builders argue that a PCE cannot be "essential" for species
conservation if it need not be present in a given critical
habitat.
    However, as discussed in the text, vernal pools must be
fed by upland areas, and the first PCE describes "[t]opographic
features characterized by mounts and swales, and depressions
within a matrix of surrounding uplands that result in complexes
of continuously, or intermittently, flowing surface water in the
swales connecting the pools."  These upland areas may not be
occupied by the species, and may not contain a vernal pool,
although they may be linked to one or several.  Regardless of
whether they contain a vernal pool, or other PCEs, they are still
essential to the conservation of the 15 vernal pool species.
    Home Builders simply pose hypotheticals suggesting that
a plain of uplands unconnected to a vernal pool or a "homeowner's
backyard studded with bits of 'inorganic debris'" may constitute
a critical habitat under this definition.  The PCEs are
sufficiently specific to preclude such an outcome--the first PCE
describes a matrix of uplands that result in water that flows to
pools, and the fourth PCE requires structure within the pools
consisting of organic and inorganic materials.  Moreover, Home
Builders do not present scientific data to the contrary, and when
prompted to do so during oral argument, counsel for Home Builders
could not explain how vernal pools could be better described in
light of the evidence available.

35

particular, they contend that there is no indication of the size
of the uplands or the mounds or swales they contain, and no
explanation of what kind of food in the form of detritus would be
acceptable.  Home Builders cite other situations in which the FWS
has provided limits on uplands essential to the conservation of
other species, including the California tiger salamnder and the
California red-legged frog.  (Pls.' Home Builders' Mot. for Summ.
J. 15.)  As the Federal Defendants note, however, in both of
these instances, the FWS placed limitations on the upland habitat
based on the available scientific evidence.  See 70 Fed. Reg.
74,138, 74,146-47 (Dec. 14, 2005) (circumscribing the tiger
salamander's upland range because "[t]he only known study we are
aware of that specifically investigated movement of California
tiger salamanders between breeding ponds projected that 0.70 mi
(1.1 km) would encompass 99 percent of interpond dispersal"); 70
Fed. Reg. 66,906, 66,912 (Nov. 3, 2005) (delimiting "[u]pland
habitat that contains the features essential to the conservation
of the species" to 200 feet surrounding the aquatic habitat
"based on the dispersal capabilities of the subspecies" and on
two studies that indicated that the subspecies could inhabit
upland habitats in a 200 foot radius of the acquatic habitats for
between twenty and seventy-seven days).

        By contrast, Home Builders do not reference scientific
data with regard to the species or PCEs in this case that the FWS
should have considered and disregarded.  See Kern County Farm
Bureau v. Allen, 450 F.3d 1072, 1081 (9th Cir. 2006) (concluding
that a plaintiff's argument that the FWS failed to rely on the
best scientific data available was insufficient because the

36

plaintiff "point[ed] to no data that was omitted from

consideration," and "absent superior data . . . occasional

imperfections do not violate § 1533(b)(1)(A)" (quoting Building

Indus. Ass'n of Superior Cal. v. Norton, 247 F.3d 1241, 1246

(D.C. Cir. 2001)) (modification removed)).  The scientific

evidence the agency relied on merely indicated that uplands and

detritus are crucial to the survival of the species, but did not

indicate the size of the uplands or the kinds of detritus

necessary.  See, e.g., 70 Fed. Reg. at 46,924-25 ("Upland areas

associated with vernal pools are also an important source of

nutrients to vernal pool organisms (Eriksen and Belk 1999; Wetzel

1975).

        Vernal pool habitats derive most of their nutrients

from detritus (decaying matter) washed into pools from adjacent

uplands, and these nutrients provide the foundation for a vernal

pool aquatic community's food chain.  Detritus (both living and

dead organic matter) is a primary food source for the vernal pool

crustaceans addressed in this rule (Eriksen and Belk 1999)."); 68

Fed. Reg. at 46,704 (noting that the matrix of surrounding

uplands "contribute to the filling and drying of the vernal pool,

maintain suitable periods of pool inundation, and maintain water

quality and soil moisture to enable the 15 vernal pool species to

carry out their lifecycles."); 68 Fed. Reg. at 46,688 ("Fairy

shrimp are filter feeders, and consume algae, bacteria, protozoa,

rotifers, and bits of detritus as they move through the water.").

Thus, the FWS's description of these PCEs is reasonably specific,

and the court has no cause to disturb the agency's finding.

        Home Builders additionally argue that the length of the

hydroperiods are insufficiently identified, but do not present scientific evidence that the FWS neglected to consider.  (Home Builders' Mot. for Summ. J. 15.)  Under element (ii), the pools must be inundated for different amounts of time, depending on the species, ranging from eighteen to forty-one days.  As described in the PCEs themselves, the length of time the pools are inundated is an element necessary to ensure "vernal pool crustacean hatching, growth, and reproduction," during at least some years.  The amount of time required for these activities varies by species.  See 70 Fed. Reg. at 46,934-36 (tailoring the hydroperiod length to the minimum maturation times for fairy shrimp based on a 1998 study).  Moreover, the amount of annual precipitation in the Mediterranean climates where vernal pools are found fluctuates from year to year.  67 Fed. Reg. at 59,885.  Thus, as with the elements of the PCEs in general, the FWS's determination of this PCE is based upon scientific evidence, and Home Builders' arguments to the contrary are unpersuasive because they have no scientific basis.[8]

      c.    Failure to Identify the Point at which
                  Conservation will be Achieved

---

[8]    Additionally, Home Builders contend that elements (i) and (ii) of the PCEs are contradictory--element (i) describes "complexes of continuously or intermittently flowing surface water in the swales connecting the pools," whereas element (ii) denotes vernal pools that are inundated only seasonally.  This argument is largely semantic.  Swales are "shallow drainages that carry water seasonally," but they may "remain saturated for much of the wet season."  68 Fed. Reg. at 46,685.  It is entirely reasonable to describe a drainage that is continuously saturated during a particular time of year as having "continuously flowing surface water" at that time.  Therefore, the court is not persuaded that this superficial inconsistency renders the description of the PCEs unreasonable.

1    Home Builders contend that because the FWS has not

2 determined when the protected species will be deemed conserved,

3 the FWS is unable to make a determination as to what PCEs are

4 essential to the conservation of the species.  In support of this

5 argument, Home Builders rely on Home Builders Ass'n of N. Cal. v.

6 FWS ("HBANC"), 268 F. Supp. 2d 1197, 1214 (E.D. Cal. 2003), in

7 which Judge Ishii concluded that "if the Service has not

8 determined at what point the protections of the ESA will no

9 longer be necessary for the [conservation of the listed species],

10 it cannot possibly identify the physical or biological features

11 that are an indispensable part of bringing the [species] to that

12 point."  The court in HBANC did not cite any caselaw for this

13 proposition and instead arrived at it through the application of

14 logic.  After examining the statutory provisions of the ESA, this

15 court is unpersuaded by the logic in HBANC, and will therefore

16 take a different approach.

17    PCEs are simply "physical or biological features

18 essential to the conservation of the species" that "may require

19 special management considerations or protection."  16 U.S.C. §

20 1532(5)(A)(i).  It is true that a PCE described in a critical

21 habitat designation must be "essential to the conservation of the

22 species."  16 U.S.C. § 1532(5)(A)(i).  Further, under the ESA,

23 "the terms 'conserve', 'conserving', and 'conservation' mean to

24 use and the use of all methods and procedures which are necessary

25 to bring any endangered species or threatened species to the

26 point at which the measures provided pursuant to this chapter are

27 no longer necessary."  16 U.S.C.A. § 1532.  Although PCEs must be

28 described in a critical habitat designation, there is no

indication in the ESA that the agency must simultaneously prepare objective, measurable criteria indicating when the ultimate goal of conservation of the species will be achieved.

By contrast, the subsections of the ESA relating to the development of recovery plans do contain such a requirement:

> The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species . . .  The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable --
>
> . . . .
>
> (B) incorporate in each plan--
>
>> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
>>
>> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list . . . .

16 U.S.C. § 1533(f)(1).  Thus, in the context of recovery plans, the ESA contains a requirement that the FWS incorporate in their recovery plan the objective, measurable criteria that will indicate when conservation has been achieved.  The lack of a similar provision in the context of critical habitat designation indicates that Congress did not intend to require conservation criteria to be determined at that stage or in that context.  <u>See Gozlon-Peretz v. United States</u>, 498 U.S. 395, 404 (1991) (stating that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting

Russello v. United States, 464 U.S. 16, 23 (1983)).  Thus, Home Builders' argument appears to be inconsistent with Congressional intent.[9]

Additionally, it not clear why the determination of the point at which conservation will be achieved is necessary to identify the elements of a habitat that are essential to conservation of the species.  An element of the environment that is necessary to the survival of a species, such as food, shelter, or any necessary condition for its habitat to exist, would be essential to conservation of the species regardless of when or if conservation is achieved.  Simply put, if the food a species needs to survive was not present in a particular area, the goal of conserving that species in that area would be unattainable.[10] Therefore, the court must disagree with the conclusion in HBANC and will not require the FWS to have determined the point at which conservation of the vernal pool species would be achieved.

        d.    Failure to Adequately Identify the Specific Areas within the Geographic Area Occupied by the Species Where the Essential Physical or Biological Features are Found

---

[9]    Moreover, a Draft Recovery Plan prepared by the FWS in October, 2004, does contain a section devoted to "Recovery Criteria."  This section denotes species-specific recovery criteria, including criteria related to species occurrence and habitat protection, reintroduction, and seed banking.  (Supp. to the Admin. Record (Documents Cited in the Admin. Record), Draft Recovery Plan at III-84 through III-113 (October, 2004).)

[10]    Home Builders make this point themselves, although in the context of a different argument.  They note, "[i]t does not require a science degree to recognize that no species can survive without food. . . . How will these species survive, let alone recover, without food?"  (Home Builders' Mot. Summ. J. 19.)

Home Builders argue that the FWS improperly designated critical habitat by including areas that do not contain the essential physical or biological features for the species.  The FWS admittedly did not exclude every developed area within the critical habitat designation, although it "made every effort to avoid designating developed areas such as buildings, paved areas, boat ramps, and other structures that lack the PCEs for the 15 vernal pool species."  70 Fed. Reg. at 46,930.  To this, Home Builders responds that relying upon Section 7 consultations to resolve the issue improperly delays the critical habitat designation.[11]  However, the FWS also noted that any structures inadvertently left inside the critical habitat designation would not be subject to Section 7 consultation unless they had some effect on the species or PCEs.  Id. ("Any such structures inadvertently left inside critical habitat boundaries are not considered part of the unit . . . [and] would not trigger section 7 consultations.").

Because of the exhaustive methods used by the FWS to designate critical habitat, and Home Builders' silence on whether there would be another method to obtain a more precisely delineated critical habitat, the court cannot conclude that the agency's actions were unreasonable or an abuse of discretion.

---

[11]   "For any federal action that may affect a threatened or endangered species (or its habitat), the agency contemplating the action [] must consult with the consulting agency . . . ."  Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1063 (9th Cir. 2004).  The purpose of the consultation is to ensure that the federal action is unlikely to jeopardize the continued existence of the species and will not result in the destruction or adverse modification of the critical habitat designated for the species.  Id.

The FWS initially used a computer program that evaluated
Geographic Information System data from governmental agencies, as
well as private sources.  68 Fed. Reg. at 46,713.[12]  The following
information was included in the Geographic Information System
data: (1) current and historical species locations obtained from
the California Natural Diversity Database, (2) maps of vernal
pool grassland habitats, and (3) published species occurrence
data in the FWS's possession.  Id.  These data were mapped[13] onto
satellite aerial photography for the vernal pool regions that had
been identified in the relevant scientific literature.  Id.

Following an initial determination of the areas derived
from these data, the FWS refined their maps using satellite
imagery, watershed boundaries, geological information,
elevational modeling data, soil type information, vegetation/land
cover data, and agricultural and urban land use data.  Id.  They
refined the areas selected by eliminating areas that did not have
the appropriate plant species and developed areas that did not
contain the PCEs.  Id.  After publication of the September 24,
2002, proposed rule and a notice and comment period, the FWS
evaluated its proposed critical habitat units once more based on
information it had received.  Id.  This included information from

---

[12]     The FWS explained their procedures for designating
critical habitat in the August, 2003 and August, 2005 rules, and
the Federal Defendants concisely reiterate these procedures in
their motion for summary judgment.

[13]     The FWS generated legal descriptions of critical
habitat units on Universal Transverse Mercator gridlines set
every 328 feet, based on the implementing regulations of the ESA,
which require the agency to use "reference points and lines as
found on standard topographic maps of the area."  68 Fed. Reg. at
46,704; 50 C.F.R. § 424.12(c).

local experts regarding the vernal pool habitats and species, detailed aerial photography sent in by county planning departments, computer-generated images of aerial photographs manipulated to have the geometric properties of a map, and in-person examinations of various locations.  Id.  The FWS used additional data from the Geographic Information System, including local data sets for specific areas; topographical information from the U.S. Geological Society; and smaller scale mapping efforts from regional entities.  Id.  Yet the FWS recognized that even this effort would not produce a perfect result, and that some developed areas would have inadvertently been incorporated into the critical habitat units.  70 Fed. Reg. at 46,930, 46,943.

Arguing that the FWS did not sufficiently specify the boundaries of the designation, Home Builders cites HBANC for the proposition that a critical habitat designation that includes "buildings, roads, canals, railroads, and large bodies of water" that do not contain "habitat components" or "one or more of the primary constituent elements" is an improper designation.  268 F. Supp. 2d at 1216.  In HBANC, however, the defendants simply relied on the fact that section 7 consultation would not occur on developed areas, and argued that plaintiffs were seeking "an impracticable level of certainty in regard to the designation of the critical habitat."  Id.

Federal Defendants, by contrast, have expressly described the careful procedures by which they determined what land constitutes critical habitat and sought to avoid designating developed areas as critical habitat.  They simply have conceded that their methods are likely to be somewhat fallible, and Home

Builders have taken that admission to mean more than it does.
The court cannot conceive of additional methods that the Federal
Defendants could have reasonably undertaken to attain a higher
degree of precision in their critical habitat designation, and
Home Builders have not described any alternatives that would
improve the designation.[14]  For these reasons, the court finds
that the FWS adequately identified the critical habitat units.[15]

e.   Improper Economic Impact Analysis

The ESA provides that, "The Secretary shall designate
critical habitat . . . after taking into consideration the
economic impact . . . of specifying any particular area as
critical habitat."  16 U.S.C. § 1533(b)(2).  The Secretary "may
exclude any area from critical habitat" if "the benefits of such
exclusion outweigh the benefits of specifying such area as part
of the critical habitat . . . ."  Id.  The ESA thus provides a
standard by which to measure an agency's choice to exclude an
area based on economic or other considerations.  The agency's

[14]   As its sole alternative proposal, Home Builders
indicates that Caltrans provided information regarding
transportation rights-of-ways that should be excluded, and the
FWS noted that it "did not have the time, resources, or
appropriate GIS data layers to segregate these areas from
adjacent vernal pool habitat . . . ."  68 Fed. Reg. at 46,698.
Although such a situation is clearly not ideal, the court cannot
say from this evidence that the agency's determination was
arbitrary or capricious.

[15]   Additionally, Home Builders contend that the FWS must
separately identify the geographical area occupied by the species
prior to designating critical habitat.  Home Builders cites no
authority for this requirement, aside from Webster's Third New
International Dictionary and its own reading of the statute.  For
the reasons discussed in the text, the court concludes that the
FWS did not make its critical habitat determination in an
arbitrary or capricious manner, and this unsupported argument
does not disturb the court's conclusion.

decision to exclude is not mandatory, but permissive.

As the Federal Defendants point out, the legislative history of the statute confirms this reading, and clarifies that the Secretary "is not required to give economics or any other 'relevant impact' predominant consideration in his specification of critical impact. . . . The consideration and weight to be given to any particular impact is completely within the Secretary's discretion."  H.R. Rep. No. 95-1625, at 16-17 (1978), 1978 U.S.C.A.N. 9453, 9466-67.  Where there are no substantive standards by which a court can review an agency's action, that action is committed to agency discretion.  See Selman v. United States, 941 F.2d 1060, 1063-64 (10th Cir. 1991).  Here, the court has no substantive standards by which to review the FWS's decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion.  Thus, to the extent that any of Home Builders' arguments relate to the FWS's decisions not to exclude tracts, the court will not consider them.[16]

Home Builders also argue that the FWS erred by using a methodology contrary to the Tenth Circuit's guidance in New Mexico Cattle Growers v. U.S. Fish & Wildlife Service, 248 F.3d 1277, 1285 (10th Cir. 2001).  New Mexico Cattle Growers requires

---

[16]   Home Builders argue that, based on the Federal Defendants' concession that the critical habitat designation inadvertently included some developed areas, the economic benefits of designation are overstated and the cost-benefit analysis is flawed.  As discussed, supra, it is unclear how the FWS could have avoided the inclusion of some developed areas in its critical habitat designation, and the court cannot say that consideration of some area inadvertently included in the critical habitat designation led to an economic analysis that was arbitrary, capricious, or contrary to law.

that, to evaluate a critical habitat designation, an agency must take into account "all of the economic impacts of a critical habitat designation regardless of whether those impacts are attributable co-extensively to other causes." Id. at 1284-85. In other words, the FWS must consider both the economic impact of the critical habitat designation itself and the economic impact of listing a species. Id.

The FWS expressly indicated that it followed the guidance provided by the Tenth Circuit in Cattle Growers, and that its "draft economic analysis estimates the total cost of species conservation activities without subtracting the impact of pre-existing baseline regulations (i.e., the cost estimates are fully co-extensive)." 70 Fed. Reg. at 46928. Moreover, to estimate the potential economic impact of the critical habitat designation, the FWS retained a consulting firm, CRA International. CRA International projected the economic effects that would occur in the census tracts affected by the designation, above and beyond the baseline of the existing regulatory and economic burden landowners and managers currently bear. (Admin R., Vol. 2, Doc. 358 at 45-46.) CRA International also determined the administrative costs that would be associated with Section 7 consultations, which were the primary impacts expected. (Id. at 10, 44.) CRA International considered costs attributable to the jeopardy standard (relating to the listing of a species) and costs due to the adverse modification standard (relating to the designation of critical habitat). (Id. at 10.) Because the vernal pool species occupy the critical habitat, it was "difficult [to] mak[e] a credible distinction between listing

47

and critical habitat effects within critical habitat boundaries."
(Id.)  Thus, CRA determined that "[t]he administrative costs of
these consultations, along with the costs of project
modifications resulting from these consultations, represent
compliance costs associated with the listing of the species and
the designation of critical habitat."  (Id. at 10, 44.)
Therefore, this analysis clearly considers the co-extensive
costs.[17]

Relatedly, Home Builders argue that the FWS's exclusion
of twenty-three census tracts was erroneous because the FWS did
not explain the basis for its decision to exclude only twenty-
three of 158 tracts, and because the FWS failed to consider the
relative costs of the negative economic impacts, based on the
socioeconomic profile of each individual tract.  Significantly,
the Congressional record indicates that "[t]he consideration and

---

[17]   Although the FWS expressly indicated in its analysis
that it took into account both the economic impact of listing the
species and the economic impact of the critical habitat
designation, see Admin. R. at 17022653 (Economic Impacts of
Critical Habitat Designation for Vernal Pool Species (June 2005)
at 7), Home Builders argue that other portions of the report
imply otherwise.  In particular, Home Builders note that the
analysis makes mention of only critical habitat designation, and
not listing a species, in two separate places.  See id. at
17022697 ("If such effects would not have occurred in the absence
of critical habitat (i.e., "but for" critical habitat), then they
are considered by this analysis to be an impact of the
designation."); id. at 17022698 ("To the extent that delays
result from the designation, they are considered in the
analysis.").
     It does not follow from these sentences that the FWS
did not consider the economic impact of listing a species, and
the court is not persuaded that it should infer from these minor
omissions that the FWS has mischaracterized its analysis in a
more favorable light. The same reasoning also applies to Home
Builders' suspicions that, despite its statements to the
contrary, the FWS did not consider costs associated with Sections
9 and 10.  (See Home Builders' Mot. for Summ. J. 34.)

weight given to any particular impact is completely within the
Secretary's discretion."  H.R. Rep. No. 95-1625, at 16-17 (1978),
1978 U.S.C.C.A.N. at 9466-67.

        The FWS took into account the co-extensive costs
previously discussed, and determined that the estimated cost of
the designation was $965 million over the next 20 years, due to
the "opportunity costs associated with the commitment of
resources required to accomplish species and habitat
conservation."  Id. at 10, 47-53.  Based on the weighing of these
costs, the FWS excluded twenty-three census tracts from the final
critical habitat designation.  The FWS decided to exclude twenty-
three tracts because they would result in the potential avoidance
of approximately eighty percent of the potential costs of
critical habitat designation, and would not result in extinction
of a species.  70 Fed. Reg. 46,948-52.  More specifically, the
FWS determined that by excluding the 20 areas that would suffer
the greatest economic loss if designated as critical habitat
(alternatively, twenty-five percent of the critical habitat), it
could avoid approximately 80 percent of the total costs.  70 Fed.
Reg. at 37740.  Thus, the FWS rationally excluded the twenty
tracts projected to have the most detrimental economic impact.
This decision clearly involved weighing the benefits and costs of
exclusion, and this is the type of decision to which this court
must defer.

        The FWS also excluded three additional tracts: a tract
in Merced county associated with the construction of the
University of California at Merced that would have suffered a $10
million impact, a tract in Tehama county that would suffer a $6

million impact because of an ongoing transportation project, and a tract in Placer county adjacent to another excluded tract because a development plan extending over both tracts would result in a significant portion of the growth projected to occur in the area.  70 Fed. Reg. 46,948-52.[18]

Although the FWS did provide a logical reason for the exclusion of the twenty most-impacted tracts, the explanation provided for two of the three additional tracts that were excluded is inadequate.  In its final rule, issued on August 11, 2005, the FWS noted as follows:

> As we finalized the economic analysis, we identified high costs associated with the critical habitat designation to public projects in Tehama and Merced County.  These public projects were the development of the UC Merced Campus and the widening of Highway 99 in Tehama County.  The final economic analysis indicates additional costs in census tracts in which these projects were located were $10,000,000 for UC Merced and $6,093,965 for Highway 99.  On the basis of the significance of these costs, we determined that these two census tracts also should be excluded. In addition, information received during the comment period indicated that the Placer Vineyards Specific Plan was located in two census tracts in Placer County, one of which was identified in the Draft Economic Analysis as being in one of the 20 highest cost areas, and one of which was not.  As a result,

---

[18]   The court notes that this choice did take into consideration, to some degree, the relative harm that the individual tracts would suffer based on their socioeconomic profiles.  Among the twenty-three census tracts ultimately excluded are eleven of the twelve counties that were projected to suffer the highest impact relative to aggregate household income. 70 Fed. Reg. at 46,949-50.  Moreover, to the extent Home Builders' argument that the agency should have considered the relative impact of the economic costs is a disagreement with the methodology used by FWS, "[m]ere disagreement with an agency's policies, methodologies, and conclusions does not render the decision arbitrary and capricious."  Sierra Club v. Dombeck, 161 F. Supp. 2d 1052, 1070-71 (D. Ariz. 2001).

> impacts for the two affected census tracts were aggregated in the final analysis, which significantly increased the costs in the second census tract.  For this reason, it too, is being excluded from the final critical habitat designation.

70 Fed. Reg. 46,950.

Thus, as to the University of California at Merced and Tehama county tracts, the FWS merely highlighted the monetary benefit to excluding these tracts, and provided no additional explanation.  There is no indication that these two tracts are among the twenty-two most impacted tracts.  The FWS simply concludes that the high cost of inclusion justifies exclusion, without making a relative comparison amongst all tracts.  This appears to be inconsistent with the rest of the logic employed by the FWS in its exclusion analysis.  Thus, the two tracts relating to public works projects that were excluded as the FWS "finalized the economic analysis" appear to have been excluded arbitrarily. "The agency is obligated to 'articulate[ ] a rational connection between the  facts found and the choices made.'" Pac. Coast Fed'n of Fishermen's Assocs. v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1091 (9th Cir. 2005) (quoting NRDC v. Dep't of Interior, 113 F.3d 1121, 1126 (9th Cir. 1997)).  Because the FWS failed to do so adequately with respect to these two tracts, the court concludes that their exclusion should be set aside.

However, the FWS did articulate a reason for excluding an additional tract in Placer county because of a development plan that encompassed that tract and would result in a significant portion of growth in the area.  The FWS's exclusion of the twenty most-impacted tracts depended in part upon a

development project that extended past one of those twenty tracts and into another tract that was not excluded.  The FWS noted that "[s]ince a single development accounts for a significant fraction of growth in this area, segregating impacts by Census Tract may be artificial.  Thus, impacts for tracts 06061020902 and 06061021301 are aggregated in the final analysis."  70 Fed. Reg. at 46,931.  The FWS logically excluded this tract in order to maintain the remainder of the exclusions, and the court cannot conclude that this additional exclusion was arbitrary and capricious.

　　　　　　　　f.　<u>NEPA Violation</u>

　　　　　　　　Home Builders and the City of Suisun contend that the FWS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, by failing to prepare an Environmental Impact Statement or an Environmental Assessment for its critical habitat designation.  NEPA is "our basic national charter for protection of the environment. . . . [I]t establishes policy, sets goals . . . and provides means for carrying out the policy." 40 C.F.R. § 1500.1(a).  NEPA requires that an Environmental Impact Statement be prepared for all "major Federal actions significantly affecting the quality of the human environment." Id. (quoting 42 U.S.C. § 4332(C)).  However, the Federal Defendants point out, and plaintiffs Home Builders concede (Pls.' Home Builders' Mot. for Summ. J. 42-43),[19] that there is binding Ninth Circuit authority that precludes a challenge under NEPA for

---

[19]　　Plaintiffs Home Builders have made this argument in order to preserve their right to challenge Douglas County on appeal.

a critical habitat designation made pursuant to the ESA.  In

Douglas County v. Babbit, the Ninth Circuit found that

> NEPA does not apply to the Secretary's decision
> to designate a habitat for an endangered or
> threatened species under the ESA because (1)
> Congress intended that the ESA critical habitat
> procedures displace the NEPA requirements,
> (2) NEPA does not apply to actions that do
> not change the physical environment, and
> (3) to apply NEPA to the ESA would further
> the purposes of neither statute.

48 F.3d 1495, 1507-08 (9th Cir. 1995).  Accordingly, plaintiffs

Home Builders' arguments that the FWS should have complied with

the requirements of NEPA fail as a matter of law.

    4.   Environmental Groups' Motion for Summary Judgment

        The Environmental Groups argue that the FWS's cost-

benefit analysis was flawed because the agency improperly weighed

excessive economic costs against inadequately-determined

benefits, and improperly made non-economic exclusions to the

Carrizo Plain National Monument, National Wildlife Refuges, lands

subject to Habitat Conservation Plans, and lands subject to other

management plans.

        a.   Data Regarding Economic Benefits

        The Environmental Groups make several arguments

regarding the arbitrariness of the FWS's cost and benefit

calculations with regard to critical habitat designation.

Pursuant to § 4(b)(2) of the ESA, the FWS has a mandatory duty to

consider the economic and other impacts of a critical habitat

designation using the "best scientific data available."  16

U.S.C. § 1533(b)(2).  There are no express provisions in the ESA

regarding what "economic impact" means, and nothing is mentioned

about "economic benefits."  See 16 U.S.C. § 1533.  This court has

53

previously explained that "it stands to reason that in order to consider the economic impact, defendants must consider both the positive and negative impact." Butte Environ., No. 04-0096, at 12. The court also indicated that it was unaware of any authority that explains how to consider economic impact or that specifically requires that the economic benefits of designation be quantified. Id.

The FWS concluded that expressing benefits in economic terms was prohibitively difficult, noting that the benefits of designation "reflect broader social values, which are not the same as economic impacts." (Admin. R. Vol. 2 at 17021468.) The FWS therefore determined that "the benefits of critical habitat designation are best expressed in biological terms." (Admin. R. 05008574; 17022691.) The FWS further explained this conclusion in their August, 2003 Final Rule, in which they indicated that "it is not feasible to fully describe and accurately quantify the benefits of this designation in the context of this economic analysis," and additionally that "no studies have addressed the non-use values associated with endangered vernal pool species. Thus, it is not possible to develop a monetary measure of this category of benefit." (Id. Vol. I at 05008400.)[20] The FWS also noted that, "[s]ufficient information does not exist to allow for quantification of the secondary benefits of habitat protection . . . ." (Id. at 05008405.)

---

[20]   The Environmental Groups cite this draft economic impact analysis as an example of an attempt to quantify benefits. As demonstrated by the parts of the draft report quoted in the text, it is not clear that the attempt to quantify benefits was successful.

1        The Environmental Groups argue to the contrary that
2   there was available data regarding the quantification of
3   benefits, and that the FWS ignored or even buried such data.  One
4   example they provide is the proposed methodologies that
5   economists submitted that could be used to quantify benefits.
6   Thus, the Environmental Groups would have the FWS conduct an
7   independent study into the quantification of benefits.  Notably,
8   however, "[t]he 'best available data' requirement makes it clear
9   that the Secretary has no obligation to conduct independent
10  studies."  Sw. Ctr., 215 F.3d at 60-61 (reversing and remanding a
11  district court's determination requiring the FWS to generate
12  better data by conducting a species population count).
13  Significantly, other than the benefits provided by mitigation
14  lands, the Environmental Groups have not identified any specific
15  type of benefit to be measured.  They additionally cite the
16  review of CRA's analysis by a leading academic in the field of
17  urban economics, Professor John M. Quigley at the University of
18  California at Berkeley, who stated that "[n]owhere in the
19  analytical paradigm for this work by CRA is there reference to
20  the benefits of habitat protection."  (Admin. R. Vol. 2 (Doc.
21  631).)  Professor Quigley additionally acknowledged that such
22  benefits are difficult to measure, but did not indicate how to
23  measure them.  Id.  Professor Quigley further indicated that he
24  found the analysis more generally to be "an impressive piece of
25  work," especially "[g]iven the inherent limitations in theory and
26  data, and the difficulties of translating these regulations into
27  specific changes in economic outcomes over space."  (Id. (Doc.
28  630).)  It may well be that scientific data regarding other types

of habitats would allow for the consideration of the economic benefits of a critical habitat designation.  In fact, advances in scientific knowledge about vernal pool habitats may make it possible to quantify the economic benefits related to preservation of these habitats at some point in the future. Nevertheless, from the evidence before it, the court concludes that the FWS's determination that benefits would not be measured in terms of their strict economic value appears to be reasonable, and does not invalidate their evaluation of economic impacts.[21]

The Environmental Groups further argue that, in its estimate of the costs of critical habitat designation, the FWS improperly included the economic costs of multiple conservation measures (referred to as a "co-extensive analysis") applicable to the fifteen vernal pool species, rather than just the costs of the critical habitat designation.  As previously mentioned, the ESA does not dictate how the FWS should conduct its economic impact analysis.  See 16 U.S.C. § 1533(b)(2).  In deciding to conduct its co-extensive analysis, the FWS relied on the Tenth

---

[21]    The Environmental Groups also cite extra-record evidence regarding a talk on June 8, 2006, by the author of the analysis prepared by CRA International.  However, the court is limited to evidence in the administrative record at the time the decision was made, unless the party seeking to introduce the extra-record evidence demonstrates that it falls under an exception to the general rule.  (See Motion to Strike analysis, supra.)  The Environmental Groups have not made that argument here, and the court will not consider this evidence.

Additionally, the Environmental Groups' arguments regarding settlement discussions around the economic value of mitigation lands are not the proper subject of judicial notice, as discussed supra, and will not be considered by the court.

Circuit's decision in Cattle Growers, 248 F.3d at 1285.[22]

The Environmental Groups argue that the FWS wrongly relied upon Cattle Growers, which they contend was a hard case making bad law, and failed to take adequate account of a relevant Ninth Circuit decision, Gifford Pinchot, 378 F.3d at 1063.[23]  In Gifford Pinchot, the Ninth Circuit rejected FWS's regulatory definition of "destruction or adverse modification" for lowering the standard for critical habitat designation, which requires consideration of promoting recovery of the species rather than simply ensuring its survival.  The concern in Gifford Pinchot was that the FWS's definition with respect to critical habitats effectively "read out" of the statute the limitations in place with respect to listing a species.  378 F.3d at 1069-70.

In Gifford Pinchot, the Ninth Circuit concluded that the FWS had erred by promulgating a regulation defining "destruction or adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." Id. (citing 50 C.F.R. § 402.02).  The court noted that this regulation allowed changes to the critical habitat designation in a manner that effectively ignores the recovery requirement,

_____

[22]     The court's prior analysis with regard to Home Builders' arguments that the FWS did not rely on Cattle Growers is also instructive here.  To the extent that the FWS relied on Cattle Growers and neglected to consider the effects of the critical habitat designation on species' recovery, pursuant to Gifford Pinchot, the critical habitat designation is not consistent with applicable Ninth Circuit precedent.

[23]     See Cape Hatteras Access Pres. Alliance, 344 F. Supp. 2d 108, 130 (D.D.C. 2004) (noting that Cattle Growers was "an instance of a hard case making bad law," and examining the inconsistency between Cattle Growers and Gifford Pinchot).

because a modification that affects a species' survival does greater damage to the species than a modification that would merely affect the species' ability to recover. "Because it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for species survival, the regulation's singular focus becomes 'survival.'" Gifford Pinchot, 378 F.3d at 1069. However, the "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." Id. at 1070. Accordingly, the court held that this regulation was impermissible. Id. at 1071.

Thus, the biological opinions at issue in Gifford Pinchot evaluated only whether the proposed modifications to critical habitat would impede the more dire of the two goals-- survival of the species--and ignored whether the proposed modifications would affect the goal of fostering recovery of the species. Id. at 1070-71. Additionally, the Ninth Circuit noted that an agency is afforded a presumption of regularity, meaning that it is presumed to have followed its own regulations, absent evidence to the contrary. Id. at 1072 (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971) (overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977))). Because there was no evidence in the record to rebut the presumption that the FWS had followed its flawed regulation, the Ninth Circuit invalidated the biological opinions

1    issued by the agency in Gifford Pinchot.  Id. at 107.[24]

2          The Environmental Groups argue that the FWS conducted

3    an improper economic analysis contrary to Gifford Pinchot because

4    the FWS conducted a coextensive analysis that measured the impact

5    of every conservation measure applicable to the fifteen vernal

6    pool species and because the FWS regulation invalidated by the

7    Ninth Circuit is still in effect.  The FWS has not expressly

8    withdrawn this invalidated regulation, and the Ninth Circuit also

9    explained in Gifford Pinchot that it "must [be] presume[d],

10   unless rebutted by evidence in the record, that the FWS followed

11   its [own regulation]."

12          It is in this legal framework that the court turns to

13   the evidence in the record to see whether the FWS considered the

14   recovery benefits that accompany critical habitat designation.

15   In its final rule, the FWS explained as follows:

16              While we have not yet proposed a new
                definition for public review and comment,
17              compliance with the Court's direction [in
                Gifford Pinchot] may result in additional
18              costs associated with the designation of

19

20   [24]    A similar conclusion was reached by the D.C. Circuit
     in a careful opinion that parses both Gifford Pinchot and Cattle
21   Growers as well as the FWS regulation invalidated in Gifford
     Pinchot.  The D.C. Circuit explained that,

22              Under the Service's regulation, by virtue
                of the 'and's, both listing and designation
23              result in consultations only when a species's
                survival is at stake, which makes it impossible
24              for an action to bring about a consultation if
                only recovery is at stake.  The definition of
25              the adverse modification standard, then, fails
                to account for the ESA's command that critical
26              habitat be designated for 'conservation,' and
                not merely survival.
27

28   Cape Hatteras Access Preservation Alliance v. U.S. Dept. of
     Interior, 344 F. Supp. 2d 108, 129 (D.D.C. 2004).

> critical habitat (depending upon the outcome
> of the rulemaking).  In light of the
> uncertainty concerning the regulatory
> definition of adverse modification, our
> current methodological approach to
> conducting economic analyses of our critical
> habitat designations is to consider all
> conservation-related costs.  This approach
> would include costs related to sections 4,
> 7, 9, and 10 of the [ESA], and should
> encompass costs that would be considered
> and evaluated in light of the <u>Gifford</u>
> <u>Pinchot</u> ruling.

<u>Id.</u> at 46,948.  Thus, the FWS has indicated that it was not

abiding by its invalidated regulation, but rather relying upon an

economic analysis that included the costs of recovery, pursuant

to <u>Gifford Pinchot</u>.  The FWS also noted in its final rule that

"each area designated as critical habitat may require some level

of management and/or protection to address the current and future

threats to each of the 15 vernal pool species to ensure that they

may <u>recover</u>. . . ."  70 Fed. Reg. at 46,945.  To that end, the

FWS specified several different measures that could be undertaken

to ensure recovery, including preventing invasive species from

crowding out native species, restoring the hydrology of vernal

pool complexes, and managing off-road vehicle use.  <u>Id.</u>  The FWS

further indicated that, for areas designated as critical habitat,

"[p]rimary constituent elements in these areas would be protected

from destruction or adverse modification by federal actions using

a conservation standard based on the Ninth Circuit's decision in

<u>Gifford Pinchot</u>.  This requirement would be <u>in</u> <u>addition</u> <u>to</u> the

requirement that proposed Federal actions avoid likely jeopardy

to the species continued existence."  <u>Id.</u> at 46,950.

Additionally, the FWS explained that "[c]ritical habitat is being

60

1  designated for all 11 [plant] species in other areas that will be

2  accorded the protection from adverse modification by federal

3  actions using the conservation standard based on the Ninth

4  Circuit decision in Gifford Pinchot."   Id.

5          However, these isolated instances discussing the

6  recovery standard, and assurances by the FWS that Gifford Pinchot

7  has been applied to the reasoning in the critical habitat

8  designation, are contradicted by evidence in the record.

9  Significantly, the penultimate version of the rule, issued on

10  March 8, 2005, does not mention either recovery benefits or the

11  ruling in Gifford Pinchot regarding the benefits or critical

12  habitat.  (Admin. R. Vol II: 15018098-102.)  In early August,

13  shortly before the final rule was released, the Environmental

14  Groups point out that there were emails exchanged between staff

15  members at the FWS, asking whether there was "Gifford-Pinchot

16  language in [the final rule]?"  (Admin. R. Vol. 2 (Docs. 186,

17  194, 204).)  One staffer emailed that the final rule would not be

18  approved by some members of the agency "unless we demonstrate

19  that a Gifford Pinchot analysis was completed for this rule, per

20  Mike it does not have to be in the rule, but must be in the Adm

21  [sic] Record."  (Id. (Doc. 194).)

22          In fact, it appears that new language regarding Gifford

23  Pinchot was scattered throughout the August, 2005, rule as a

24  result of the eleventh-hour email exchange amongst FWS staff

25  members.  (Admin R. Vol. 2 (Doc. 204) (The last email in this

26  series in the record indicated that the following statements

27  would be added to the final rule: "In light of the uncertainty

28  concerning the regulatory definition of adverse modification, our

current methodological approach to conducting economic analyses of our critical habitat designations is to consider all conservation-related costs.  This approach would include costs related to sections 4, 7, 9, and 10 of the Act, and should encompass costs that would be considered and evaluated in light of (or in response to . . .) the Gifford Pinchot ruling.").)  A careful examination of the Final Rule reveals that the FWS merely added language relating to the Ninth Circuit decision, instead of carefully considering and incorporating the Ninth Circuit's guidance in its critical habitat designation.

In the text of the rule, the FWS stated that "the designation of statutory critical habitat provides little additional protection to most listed species, while consuming significant amounts of available conservation resources. . . ." 70 Fed. Reg. at 46,924.  The FWS also indicated its skepticism about the additional benefits provided by critical habitat designations.  Id.  The FWS cited an article that concluded, "because the Act can protect species with and without critical habitat designation, critical habitat designation may be redundant to the other consultation requirements of section 7." Id. (emphasis added).  Accordingly, there is insufficient evidence in the record to conclude that the FWS adequately considered the recovery benefits of a critical habitat designation in coming to the conclusions in its Final Rule.

The FWS's failure to consider the recovery goal of the designation is similar to the situation in Center for Biological Diversity v. Bureau of Land Management, 422 F. Supp. 2d 1115, 1122 (N.D. Cal. 2006).  In that case, Judge Illston concluded

that, by finding "that there were no additional regulatory benefits to be gained by designating critical habitat in areas that were ultimately excluded, the Service improperly ignored the recovery goal of critical habitat." Id. Judge Illston also noted that "references to 'conservation' in the proposed and final rules cannot be squared with the reasoning in the final rule which essential equates 'jeopardy' and 'adverse modification' determinations to conclude that the regulatory benefits of critical habitat in the excluded areas was negligible." Id. at 1146. This court is similarly unconvinced that the FWS actually considered the recovery benefits of critical habitat designation, notwithstanding the fact that it referenced Gifford Pinchot, and therefore concludes that the agency's critical habitat designation was arbitrary and capricious because it failed to comply with the applicable legal standards.

Finally, the Environmental Groups contend that the FWS's relative weighing of costs against benefits failed to consider the recovery and regulatory benefits to the species upon critical habitat designation. The FWS did consider many potential benefits, including certain categories of benefits that reflect broader social values. (Admin. R. Vol. 2 at 17021468.) The FWS noted, however, that explicitly considering broader social values for the species and the habitat would duplicate the codification of the societal value of protecting species by Congress in enacting the ESA. (Id.) Additionally, the FWS did discuss at length the benefits that would be derived from the exclusion of the twenty-three census tracts at issue, including

1  the fact that vernal pool species would have increased protection

2  and landowners and the public would become educated about the

3  conservation value of the vernal pool habitat.  (Id. at 17021487-

4  88.)  The FWS also addressed the recovery benefits of designation

5  by noting that it chose to exclude only twenty-three of the total

6  158 census tracts it considered designating as critical habitat

7  to "recognize[] the benefits of including areas beyond the

8  minimum necessary to avoid extinction, despite significant

9  economic costs."  (Id. at 17021468.)  Because the agency has not

10  made an "erroneous conclusion of law" and the court cannot say

11  that the "record contains no evidence on which it could

12  rationally base that decision," the court cannot find that the

13  FWS abused its discretion with regard to its consideration of

14  benefits.  Mendenhall v. Nat'l Transp. Safety Bd., 92 F.3d 871,

15  874 (9th Cir. 1996).

16                    b.   Non-Economic Exclusions

17          The Environmental Groups contend that the FWS

18  improperly relied upon the existence of alternative land

19  management plans in weighing the costs and benefits of exclusion

20  pursuant to § 4(b)(2).  In deciding what land to exclude from its

21  critical habitat designation, the FWS determined that for certain

22  lands protected by existing management plans and practices, the

23  benefits of inclusion are likely to be minimal and outweighed by

24  the benefits of exclusion.

25           For the proposition that Federal Defendants may not

26  exclude land based on the existence of alternative land

27  management plans, the plaintiffs cite caselaw that applies to the

28  definition of critical habitat provided in another section of the

1  ESA.  See, e.g., Ctr. for Biological Diversity v. Norton, 240 F.

2  Supp. 2d 1090, 1100 (D. Ariz. 2003) (applying the definition of

3  critical habitat in ESA § 3(5)(A)); Nat. Res. Def. Council, 113

4  F.3d at 1127 (same); Conservation Council for Haw. v. Babbit, 2

5  F. Supp. 2d 1280, 1287 (D. Haw. 1998) (same).[25]  By contrast, the

6  relevant provision of the ESA here is § 4(b)(2), which permits

7  the FWS to conduct a discretionary analysis of its exclusions.

8  Thus, the Environmental Groups have not cited any authority that

9  would preclude the FWS from considering the existence of other

10  management schemes in deciding whether to exclude land from its

11  critical habitat designation.

12         More specifically, the Environmental Groups argue that

13  the Carrizo Plain National Monument was improperly excluded.  The

14  Bureau of Land Management had a draft management plan in place

15  for the Carrizo Plain National Monument, which was set to become

16  final in June, 2006.  70 Fed. Reg. at 46,947.  This plan outlines

17  "management for the long-term conservation and recovery of listed

18  plants and animals and the natural communities on which they

19  depend, and to improve and sustain populations of federally

20  listed species to meet conservation and recovery goals."  Id.

21  The species covered by the plan include the two species of fairy

22  shrimp that would have been protected by the critical habitat

23  designation.  Id.  The FWS did not merely defer to the Bureau of

24  Land Management's authority; instead, it incorporated the nature

25  of oversight by the Bureau of Land Management into its weighing

26

27         [25]   Pursuant to ESA § 3(5)(A), "designation of critical
   habitat is necessary except when designation would not be
28  'prudent' or 'determinable.'"  16 U.S.C. § 1533(a)(3).

of the benefits of inclusion versus exclusion and its determination of whether the species would become extinct absent inclusion.  Id. at 46,948.  The FWS was also responding to comments that critical habitat designation in the Carrizo Plain National Monument would "hinder essential voluntary conservation efforts."  70 Fed. Reg. at 46,929.

Additionally, the Environmental Groups contend that this court's previous order limited the scope of the exclusions the agency could make, and the agency improperly took action exceeding what the court ordered.  However, the court merely required that the FWS complete a reevaluation of the land that was excluded at the time by March 8, and did not expressly preclude any other exclusions.  Butte Envtl. Council, No. 04-0096, at 25.  Thus, the FWS was not prevented from considering the exclusion of Carrizo Plain National Monument based on this court's previous holding.[26]  Accordingly, the court finds the FWS's exclusion of the Carrizo Plain National Monument to be reasonable.

---

[26]   The Environmental Groups further argue that the FWS did not provide adequate notice of its exclusion of the Carrizo Plain National Monument lands.  "[T]he fact that a final rule varies from a proposal, even substantially, does not automatically void the regulations.  Rather, [a court] must determine whether the inclusion of the BMPs in the final rule was in character with the original proposal and a logical outgrowth of the notice and comments received."  Rybachek v. United States Environ. Protection Agency, 904 F.2d 1276, 1287-88 (9th Cir. 1990).  Here, the FWS had indicated in its June, 2005 Federal Register notice that it was soliticing comments on whether any areas should be excluded and would reconsider all previously-submitted comments.  70 Fed. Reg. at 37,740-41.  The Bureau of Land Management had requested the exclusion of Carrizo Plain National Monument lands.  70 Fed. Reg. at 11,145.  Thus, exclusion of the National Monument lands was "a logical outgrowth of the notice and comments received," and therefore procedurally adequate.

1     Similarly, the FWS reasonably determined that the

2  benefits of exclusion outweighed the benefits of inclusion for

3  areas within national wildlife refuges and within the Coleman

4  National Fish Hatchery complex.  70 Fed. Reg. at 11,151.  The FWS

5  also concluded that exclusion would not result in extinction of

6  the species.  Id.  The FWS noted that, "[a]ll of these refuges

7  are developing comprehensive resource management plans that will

8  provide for protection and management of all trust resources,

9  including federally listed species and sensitive natural

10 habitats."  Id.  Additionally, the agency explained that "[t]he

11 comprehensive resource management plan for the Kern National

12 Wildlife Refuge Complex has been completed and the associated

13 biological opinion concluded that its implementation would not

14 jeopardize the continued existence of these species."  Id.

15 (citation omitted).  For these reasons, the FWS's decision to

16 exclude the wildlife refuges from its critical habitat

17 designation was not arbitrary or capricious.

18     The FWS additionally reasonably excluded areas having

19 habitat conservation plans ("HCPs").  HCPs are developed as part

20 of a permitting process for private lands when activities related

21 to development will result in a taking of an endangered species.

22 16 U.S.C. § 1538(a)(1)(B) & (G); § 1539(a)(1)(B), (2)(A) & (B).

23 A permit is only allowed if the taking is incidental, the impacts

24 of the taking are minimized and mitigated, the applicant funds

25 the plan adequately, the plan will not appreciably reduce the

26 likelihood of species' survival and recovery, and other measures

27 required by the agency are also met.  16 U.S.C. § 1539(a)(2)(B).

28 In March 8, 2005, the FWS explained its exclusion of lands

subject to HCPs based on its determination that the benefits of exclusion outweighed the benefits of inclusion, and the species would not become extinct as a result.  70 Fed. Reg. at 11,149-51.

The FWS also examined each individual plan to determine how it should be weighed, and expressly noted that the Western Riverside county MSHCP would "address[] the primary conservation needs of the species by protecting the ecosystem upon which it relies . . . [and] provide for the longer term conservation of this pool and vernal fairy shrimp." Id. at 11,150.  In fact, the FWS explained that, "since the entire habitat area is addressed under the HCP, preserve, and mitigation bank and not just habitat with a federal nexus, the existing management already provides more protection than can be provided by a critical habitat designation." Id.  Another part of the Western Riverside MSHCP, proposed unit 34 for the critical habitat designation, is the Santa Rosa Plateau Ecological Reserve, which is "owned by The Nature Conservancy (TNC), and is cooperatively managed by TNC, the Riverside County Regional Park and Open Space District, CDFG [the California Department of Fish and Game], and the Service." Id.  Federal Defendants point out that the designation of critical habitat is not only less powerful of a protection than an HCP, but also can adversely affect the partnerships with local jurisdictions and project proponents that are need to create HCPs by imposing duplicative regulatory burdens on the people involved.  70 Fed. Reg. at 11,149.  Thus, as with the other non-economic exclusions, this exclusion was made in the FWS's reasonable exercise of discretion.

Finally, the FWS's exclusion of four areas of land

belonging to the Department of Defense was proper.  Those areas
consisted of Travis Air Force Base ("AFB"), Beale AFB, Fort
Hunter Ligget, and Camp Roberts.  Pursuant to 16 U.S.C.A. § 1533,
the FWS provided a determination in writing that these plans
provide a benefit to some of the fifteen vernal pool species for
Travis AFB and Beale AFB.  See 70 Fed. Reg. at 11,153 ("Travis
AFB has a Service-approved INRMP in place that provides a benefit
for vernal pool fairy shrimp. . . ."); id. ("Beale AFB has a
Service approved INRMP in place that provides a benefit for the
vernal pool fairy shrimp and the vernal pool tadpole shrimp.").
Additionally, both air force bases are now defunct.

        Further, although the ESA provides that Department of
Defense land may be excluded pursuant to 16 U.S.C.A. § 1533, Fort
Hunter Liggett and Camp Roberts were excluded pursuant to ESA §
4(b)(2); in other words, they were excluded under the economic
impact analysis previously discussed.  See, e.g., 70 Fed. Reg. at
11,145 ("The two Army National Guard Reserves Bases [Camp Roberts
and Fort Hunter Liggett] were excluded through § 4(b)(2) of the
Act, since the benefits of excluding outweigh the benefits of
including those vernal pool areas within the designation."); 68
Fed. Reg. at 46,750-52 (weighing the benefits of exclusion
against the benefits of inclusion into the critical habitat
designation for Camp Roberts and Fort Hunter Liggett); id. at
46,700 ("We recognize that designation of critical habitat has
the potential to modify military training operations and the use
or development of base facilities.  We have determined that the
benefits of excluding these facilities outweigh the benefits of
including them.  Subsequently, Camp Roberts and Fort Hunter

1  Liggett have been excluded from this final designation of
2  critical habitat.").
3  III.  <u>Conclusion</u>

4      Home Builders' motion for summary judgment must be
5  granted with respect to the exclusions of the two tracts with
6  ongoing public projects involving the development of the UC
7  Merced campus and the widening of Highway 99 in Tehama County.
8  In all other respects, the motions of Home Builders, Tsakopoulos
9  Investments, and the City of Suisun for summary judgment are
10 denied.

11      The Environmental Groups' motion for summary judgment
12 is granted on the limited ground that the FWS failed to consider
13 the recovery standard under the ESA, pursuant to the Ninth
14 Circuit's guidance in <u>Gifford Pinchot Task Force v. U.S. Fish &</u>
15 <u>Wildlife Service</u>, 378 F.3d 1059, 1069 (9th Cir. 2004).  In all
16 other respects, the Environmental Groups' motion for summary
17 judgment is denied, and the Federal Defendants' motion for
18 summary judgment is granted.

19      The FWS's exclusions of critical habitat pursuant to §
20 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), in its Final Critical
21 Habitat Rule of August 2005, Final Designation of Critical
22 Habitat for Four Vernal Pool Crustaceans and Eleven Vernal Pool
23 Plants in California and Southern Origin, and accompanying
24 economic analysis, must be remanded to the FWS for further action
25 and consideration consistent with all applicable laws and with
26 the reasoning in this order.

27      IT IS THEREFORE ORDERED that this matter be, and the
28 same hereby is, REMANDED to the FWS for further action and

consideration consistent with this order.  The FWS shall submit a

new final critical habitat rule to the Federal Register for

publication therein within 120 days of the date of this order.[27]

DATED:  November 1, 2006

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[27]     The court previously allowed six months for the final
designation of critical habitat, and because the necessary
changes here are simply an amendment to a prior final
designation, the court concludes that a 120 day deadline is more
than reasonable for this purpose.  See Butte Environ. Council v.
White, 145 F. Supp. 2d 1180, 1185 (E.D. Cal. 2001) (allowing six
months for the FWS to complete a final critical habitat
designation and noting that many courts have allowed only 120
days for the same action).