1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11   HOME BUILDERS ASSOCIATION OF
     NORTHERN CALIFORNIA, BUILDING
12   INDUSTRY LEGAL DEFENSE
     FOUNDATION, CALIFORNIA
13   BUILDING INDUSTRY ASSOCIATION,
     CALIFORNIA STATE GRANGE, and
14   GREENHORN GRANGE,
                                         NO. CIV. S-05-0629 WBS-GGH
15            Plaintiffs,

16   and

17   CITY OF SUISUN,                     MEMORANDUM AND ORDER

18            Plaintiff-Intervenor,

19   and

20   TSAKOPOULOS INVESTMENTS,
     TSAKOPOULOS FAMILY TRUST,
21   DROSOULA TSAKOPOULOS, and
     GEORGE TSAKOPOULOS,
22
              Plaintiff-Intervenors,
23
              v.
24
     UNITED STATES FISH AND
25   WILDLIFE SERVICE; H. DALE
     HALL, Director of the United
26   States Fish and Wildlife
     Service; UNITED STATES
27   DEPARTMENT OF INTERIOR; and
     GALE A. NORTON, Secretary of
28   the United States Department

     of Interior,

1            Defendants,

2   and

3   DEFENDERS OF WILDLIFE, BUTTE
    ENVIRONMENTAL COUNCIL, AND
4   CALIFORNIA NATIVE PLANT
    SOCIETY,
5
            Defendant-Intervenors.
6   ───────────────────────────────

7
    BUTTE ENVIRONMENTAL COUNCIL,
8   DEFENDERS OF WILDLIFE,
    CALIFORNIA NATIVE PLANT
9   SOCIETY, SAN JOAQUIN RAPTOR AND
    WILDLIFE RESCUE CENTER, SIERRA
10  FOOTHILLS AUDUBON SOCIETY, and
    VERNALPOOLS.ORG,
11
12          Plaintiffs,

13       v.

14  GALE A. NORTON, Secretary of
    the Interior, and U.S. FISH
15  AND WILDLIFE SERVICE,

16          Defendants.

17  ───────────────────────────────

18                 ----oo0oo----

19          Plaintiffs brought this action pursuant to the

20  Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.; the

21  National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et

22  seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§

23  701 et seq.  Plaintiffs challenge the United States Fish and

24  Wildlife Service's ("FWS") critical habitat designation of over

25  800,000 acres of land in California and Oregon for fifteen vernal

26  pool species.  Currently pending before the court are two motions

27  for reconsideration, clarification, or amendment of this court's

28  November 2, 2006, order, filed by plaintiff, Home Builders

                                    2

1 Association of Northern California, et al. ("Home Builders") and

2 plaintiffs and defendant-intervenors, Butte Environmental

3 Council, et al. ("Environmental Groups").  Also pending before

4 the court is a motion to intervene as a defendant, filed by the

5 Regents of the University of California ("Regents").

6 I.   Factual and Procedural History[1]

7        Pursuant to the Endangered Species Act, the FWS listed

8 as endangered fifteen species of plants and animals that live in

9 vernal pool environments.  See 43 Fed. Reg. 44,810 (Sept. 28,

10 1978); 57 Fed. Reg. 24,192 (June 8, 1992); 59 Fed. Reg. 48,136

11 (Sept. 19, 1994); 62 Fed. Reg. 14,338 (Mar. 26, 1997); 62 Fed.

12 Reg. 33,029 (June 18, 1997); 16 U.S.C. § 1533.  The fifteen

13 species are four crustaceans and eleven plants, distributed in

14 vernal pool complexes located throughout southern Oregon, parts

15 of California, and parts of northern Mexico.  70 Fed. Reg. 46,925

16 (Aug. 11, 2005).

17        In September, 1994, when the FWS listed the four

18 species of fairy shrimp as endangered, it determined that

19 critical habitat designation for the fairy shrimp was nonetheless

20 "not prudent" because "such designation likely would increase the

21 degree of threat from vandalism or other human activities."  59

22 Fed. Reg. at 48,151.  In February, 2001, this court joined other

23 courts' findings in determining that the FWS' deviation from its

24 statutory mandate to designate critical habitat, concurrently

25

26        [1]   The significant factual and procedural history of this
   case are described in greater detail in this court's prior order,
27 which parties now seek the court to reconsider.  (Nov. 2, 2006
   Order.)  For the purposes of this motion, the following relevant
28 facts are sufficient.

with the listing of a species as endangered, violated the APA. Butte Envtl. Council v. White, 145 F. Supp. 2d 1180, 1185 (E.D. Cal. 2001).

Accordingly, pursuant to an order by this court, the FWS published a proposed rule to designate 1,662,762 acres of critical habitat for the fifteen vernal pool species on September 24, 2002.  67 Fed. Reg. 59,884.  The FWS subsequently issued an "initial" final critical habitat designation on August 6, 2003, that diminished the amount of critical habitat by more than one million acres.  68 Fed. Reg. 46,684; see Butte Envtl. Council, No. 04-0096 at 4.  In January, 2004, Environmental Groups challenged these exclusions from the critical habitat designation in this court.  Butte Envtl. Council, No. 04-0096, at 4.  The court remanded for reconsideration, but did not set aside the critical habitat designation in the interim.

On March 8, 2005, the FWS confirmed its non-economic exclusion determinations in the August 6, 2003, final rule.  70 Fed. Reg. 11,140 (Mar. 8, 2005).  Subsequently, on August 11, 2005, the FWS published its final rule designating approximately 858,846 acres of critical habitat in 34 California counties and one county in southern Oregon.  70 Fed. Reg. 46,924 (Aug. 11, 2005).  This final rule excluded the 20 census tracts that would suffer the greatest economic impact, along with three for which the economic benefits of exclusion outweighed the benefits of inclusion.  Id. at 46,931-32, 46,948-52.

On March 30, 2005, Home Builders filed a complaint under the ESA, NEPA, and APA, challenging FWS's critical habitat designation, (Compl.) and on November 2, 2006, this court ruled

4

1  on five cross-motions for summary judgment. (Nov. 2, 2006
2  Order.)  The court found that the FWS's reasoning regarding its
3  exclusions from critical habitat designation failed to adequately
4  consider the recovery standard under the ESA, pursuant to <u>Gifford</u>
5  <u>Pinchot Task Force v. U.S. Fish & Wildlife Service</u>, 378 F.3d
6  1059, 1069 (9th Cir. 2004). (<u>Id.</u> at 70.)  The court additionally
7  held that the exclusion of two particular tracts from the
8  critical habitat designation (Highway 99 in Tehama County and
9  land being developed for the University of California at Merced)
10  was arbitrary and capricious, because the FWS failed to
11  adequately explain its reasoning. (<u>Id.</u>)  Accordingly, the court
12  remanded the matter back to the FWS, with instructions to submit
13  a new final rule within 120 days, consistent with the order.
14  (<u>Id.</u> at 70-71.)

15       On November 16, 2006, the Environmental Groups filed a
16  motion to amend the judgment pursuant to Rule 59(e), and on
17  November 17, 2006, Home Builders filed a similar motion.  In
18  addition, on December 11, 2006, the Regents filed a motion to
19  intervene, claiming that this court's remand of the exclusion of
20  the tract at Merced has violated a significant protectable
21  interest.

22  II.  <u>Discussion</u>

23       A.  <u>Motion for Reconsideration</u>

24       A district court may reconsider an order under either
25  Federal Rule of Civil Procedure 59(e) (motion to alter or amend
26  judgment) or Rule 60(b) (relief from judgment or order).
27  <u>Backlund v. Barnhart</u>, 778 F.2d 1386, 1388 (9th Cir. 1985).  Both
28  the Environmental Groups and Home Builders frame their motions as

being brought under Rule 59, however both motions were filed more than ten days after entry of the summary judgment order for which they seek reconsideration.[2]   The court therefore construes both motions as being brought pursuant to Rule 60(b).   Fed. R. Civ. P. 60(b) ("[o]n motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding . . . ."); see Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1463 n.35 (9th Cir. 1992) (a motion for reconsideration brought later than ten days after entry of judgment is construed as a motion brought under Rule 60(b)).

Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."   Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000).   A motion for reconsideration "should not merely present arguments previously raised, or which could have been raised in the initial summary judgment motion." United States v. Wetlands Water Dist. 134 F. Supp. 2d 1111, 1130 (E.D. Cal. 2001) (citing Backlund, 778 F.2d at 138).

Rule 60(b) "provides for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) 'extraordinary circumstances' which would justify relief."   Sch. Dist. No. 1J, 5 F.3d at 1263; Fed. R. Civ. P. 60(b).   Under Rule 60(b), reconsideration is generally only appropriate where the district

---

[2]   Rule 59(e) states that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."   Rule 54 defines "judgment" as "a decree and any order from which an appeal lies."

court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law.  See Westlands Water Dist., 134 F. Supp. 2d at 1131.[3]

### 1.   Environmental Groups' Motion

The Environmental Groups argue that this court's conclusion that the FWS failed to adequately consider the recovery standard in specifying its exclusions cannot be squared with the relief granted, asserting that the non-economic exclusions must also be remanded for reconsideration by the FWS. (Envtl. Groups Mot. for Recons. 3-7.)  The Environmental Groups also seek clarification of two aspects of this court's previous order, requesting this court: 1) to instruct the FWS that it may not engage in "coextensive" economic impact analysis of exclusions to the critical habitat designation on remand; and 2) to vacate all exclusions.  (Id. at 7-9.)

This court's November 2, 2006, order found fault with the FWS's exclusions to its critical habitat designation, as analyzed under Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), based on its failure to adequately analyze the

---

[3]    The court notes that analysis under Rule 59(e) would result in the same outcome.  Under Rule 59(e), reconsideration is appropriate only if the "district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  Sch. Dist. No. 1J, Multnomah County v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993) (limiting the use of reconsideration to "highly unusual" circumstances).

1  recovery benefits conferred by a critical habitat designation.[4]

2  (Nov. 2, 2006 Order 63.) ("This court is . . . unconvinced that

3  the FWS actually considered the recovery benefits of critical

4  habitat designation.")  With regard to the ultimate relief

5  granted, the court therefore remanded the exclusions to the FWS

6  for reconsideration consistent with the order.  (Id. at 70.)

7  ("The FWS's exclusions of critical habitat pursuant to § 4(b)(2)

8  . . . and accompanying economic analysis, must be remanded to the

9  FWS. . . .")

10      The Environmental Groups, however, point to language in

11  this court's prior order which they assert is incongruous with

12  the court's ultimate conclusion regarding consideration of the

13  recovery standard.  (Envtl. Groups Mot. for Recons. 5.) ("[T]he

14  Court cannot hold that FWS failed to consider the recovery

15  benefits while simultaneously concluding that its balancing of

16  benefits used to justify its exclusions is reasonable.") (citing

17  Nov. 22, 2006 Order 64 ("[T]he court cannot find that the FWS

18  abused its discretion with regard to its consideration of

19  benefits."))  The Environmental Groups are of course correct--the

20  paragraph beginning on page 63 of this court's November 22, 2006,

21  order was included in error and is inconsistent with the

22  preceding ten pages of discussion.  Accordingly, the court will

23  amend its prior order, withdrawing this contradictory paragraph.

24  As reasoned on pages 53 through 63 of this court's prior order,

25  the FWS's economic analysis did not adequately consider the

26

27      [4]  "Recovery benefits" refers to the requirement that the
    promulgated Rule adequately address not only the mere survival of
28  the endangered species, but also its recovery.

8

recovery benefits of critical habitat designation in designating its exclusions.

### a.   Non-Economic Exclusions

The question still remains regarding what significance that holding has for the non-economic exclusions.  The Environmental Groups contend that, because the FWS's economic analysis failed to adequately consider the recovery standard when balancing the benefits of exclusion with the benefits of designation as critical habitat, the non-economic exclusions were also invalid as a matter of law.  The court reviews the FWS's decision to exclude areas pursuant to Section 4(b)(2) "for abuse of discretion."  Bennett v. Spear, 250 U.S. 154, 172 (1997).

As explained in great detail, this court's previous order held that the FWS's engaged in improper economic analysis with regard to the exclusions from critical habitat because it neglected to consider the recovery of the species.  As the Ninth Circuit made clear in Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service, 378 F.3d 1059, 1063 (9th Cir. 2004), the definitions of "jeopardize" and "destruction or adverse modification" were sufficiently similar, so that a Section 7 consultation would be triggered, under either definition, only when a species' survival is threatened.  Accordingly, Gifford invalidated the regulation's definition of "adverse modification," as inconsistent with the ESA's recovery goal.

This court's inquiry in its November 22, 2006, order focused on a section of the Service's final rule wherein it indicated that "[t]his section allows the Secretary to exclude areas from critical habitat for economic reasons if she

determines that the benefits of such exclusion exceed the benefits of designating the area as critical habitat."  70 Fed. Reg. 46,948.  In an effort to demonstrate compliance with <u>Gifford</u>, this section of the Rule professed an allegiance to the Ninth Circuit's guidance.  70 Fed. Reg. 46,948 ("[O]ur current methodological approach to conducting economic analyses of our critical habitat designations is to consider all conservation-related costs.").

This court found, however, that despite the FWS's assertions that they considered recovery in their economic analysis, the few references to the recovery standard in this section of the rule merely constituted last minute additions of language, in a hollow attempt to satisfy <u>Gifford</u>.  (Nov. 2, 2006 Order 60-63.)  The economic analysis used to designate these twenty three exclusions was improper, and accordingly these exclusions were remanded back to the FWS.

The various non-economic exclusions, however, did <u>not</u> employ the same such balancing of economic benefits and costs-- indeed, by definition, these exclusions were based on <u>non-economic</u> factors.[5]  Of course, regardless of the type of analysis used to exclude areas from the critical habitat designation, the FWS continues to have an obligation to consider the recovery goals of the ESA.  To this end, this court conducted a separate inquiry into the FWS's analysis of the non-economic exclusions. (Nov. 2, 2006 Order 64-70.)  After lengthy analysis, this court

---

[5]     16 U.S.C. 1533(b)(2) does not specify exactly how an agency is to analyze exclusions, merely that it determine whether the "benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat."

1   found that FWS had reasonably concluded that the non-economic

2   exclusions were governed by alternative land management plans

3   which already adequately incorporated the ESA's recovery goals.

4   (Id. at 65 (affirming exclusion of Carrizzo Plain National

5   Monument); id. at 67 (affirming exclusion of national wildlife

6   refuges and the Coleman National Fish Hatchery complex); id. at

7   67-68 (affirming exclusion of lands with Habitat Conservation

8   Plans ("HCPs")); id. at 69 (affirming exclusion of two areas of

9   land belonging to the Department of Defense).[6]  Thus, while the

10  twenty three economic exclusions were remanded for consideration

11  of the recovery goals, this court found that the non-economic

12  exclusions sufficiently followed Gifford's reasoning and were not

13  an abuse of discretion requiring remand.

14              b.   Coextensive Economic Analysis

15          The Environmental Groups also seek clarification from

16  this court, requiring express instruction that the FWS may not

17  consider coextensive costs in its analysis on remand.  In order

18  to understand the impact of this court's previous order with

19

20          [6]   The rule indicates that FWS's analysis considered
    recovery for: 1) Carrizzo Plain National Monument by noting that
21  "Goals and Implementation Guidelines of the CPRMP include
    management for the long-term conservation and recovery of listed
22  plants and animals," 70 Fed. Reg. 46,947; 2) national wildlife
    refuges and the Coleman National Fish Hatchery complex by noting
23  that exclusion will not appreciably increase the likelihood of
    activities that would "diminish the value of the habitat for
24  conservation of the species," 70 Fed. Reg. 11,151; 3) lands
    governed by HCP's, by noting that "[t]he purpose of such an HCP
25  is to describe and ensure . . . that the action does not
    appreciably reduce the survival and recovery of the species," 70
26  Fed. Reg. 11,151; and 4) Department of Defense lands by noting
    that they were excluded pursuant to 16 U.S.C. 1533(a)(3)(B),
27  prohibiting designation of critical habitat for lands subject to
    integrated natural resource management plans (INRMPs), 70 Fed.
28  Reg. 11,153-54.

1  regard to coextensive analysis, it is necessary to briefly

2  recount the court's reasoning parsing two relevant cases, New

3  Mexico Cattle Growers v. U.S. Fish & Wildlife Service, 248 F.3d

4  1277 (10th Cir. 2001), and Gifford Pinchot, 378 F.3d 1059.

5          The Cattle Growers case rejected a "baseline" approach

6  to analyzing the economic impact of critical habitat designation,

7  in favor of a "coextensive" approach.  Cattle Growers, 248 F.3d

8  1285.  A baseline approach uses a "but for" method of determining

9  what economic impacts flow from a critical habitat designation.

10 By contrast, a coextensive approach to analyzing economic impact

11 allows an agency, in considering the impact of a critical habitat

12 designation (whose purpose is ensuring the survival and recovery

13 of the species), to also consider the economic impact of listing

14 the species as endangered (whose sole purpose is ensuring the

15 survival of the species).

16         Admittedly, some courts have criticized the reasoning

17 of Cattle Growers, because the coextensive analysis permits an

18 agency to consider the economic impact of listing a species in

19 contravention of the ESA's intent.[7]  Cape Hatteras Access Pres.

20 Alliance v. U.S. DOI, 344 F. Supp. 2d 108, 130 (D.D.C. 2004)

21 ("The Service, however, must not allow the costs below the

22 baseline to influence its decision to designate or not designate

23 areas as critical habitat.  That would be inconsistent with the

24 ESA's prohibition on considering economic impacts during the

25

26         [7]    The ESA mandates that an endangered species listing
   determination be based "solely on the basis of the best
27 scientific and commercial data available."  16 U.S.C. §
   1533(b)(1)(A).  Economic analysis is not a factor in the
28 analysis.

1  species listing process."); see also <u>Ctr. for Biological</u>

2  <u>Diversity v. Bureau of Land Mgmt</u>., 422 F. Supp. 2d 1115, 1152

3  (N.D. Cal. 2004).  However, in <u>Cattle Growers</u>, the court was

4  given the choice between possibly ruling contrary to the ESA's

5  intent (via coextensive analysis), or explicitly violating the

6  ESA's provision that a critical habitat designation be made upon

7  consideration of the "economic impact."  As discussed <u>supra</u>, this

8  was because the definition of "adverse modification" effectively

9  conflated the survival and recovery goals of the species, thereby

10 subsuming and rendering null any beneficial impact of critical

11 habitat designation, analyzed in comparison to the impact

12 benefits conferred by listing a species.  See <u>Cattle Growers</u>, 248

13 F.3d at 1284-85.

14        However, courts and agencies are no longer "hamstrung

15 by [their] inability to consider the validity of 50 C.F.R. §

16 402.02," <u>Cape Hatteras</u>, 344 F. Supp. 2d at 129-30, because the

17 court in <u>Gifford</u> explicitly invalidated that provision.  378 F.3d

18 at 1071.  Thus, an agency is no longer prevented from engaging in

19 a meaningful analysis of the economic impact of a critical

20 habitat designation, above and beyond the impact of listing a

21 species.  While this does undercut the reasoning that the <u>Cattle</u>

22 <u>Growers</u> court used to invalidate the baseline approach, it does

23 <u>not</u> require the conclusion that a coextensive analysis is legally

24 improper.

25        The ESA mandates that the FWS consider various impacts

26 (economic and other) "of specifying any particular area as

27 critical habitat."  16 U.S.C. 1533(b)(2).  It does not, however,

28 mandate that in its analysis of those impacts, the FWS be

13

precluded from also considering the impact of listing the species as endangered.  Indeed, the statute's language appears to anticipate a broad inquiry regarding any potential impacts of the critical habitat designation.  16 U.S.C. 1533(b)(2) (mandating consideration of "and any other relevant impact").  In this respect, Cattle Growers and Gifford Pinchot are not mutually exclusive--as long as the recovery goals of the ESA are given appropriate consideration.[8]

In its final rule, the FWS indicated that in "conducting economic analyses, we are guided by the 10th Circuit Court of Appeal's [sic] ruling in New Mexico Cattle Growers v. U.S. Fish & Wildlife Service, 248 F.3d 1277 (10th Cir. 2001), which directed us to consider all impacts, 'regardless of whether those impacts are attributable co-extensively to other causes.'" 70 Fed. Reg. 46,948.  As explained in the November 22, 2006, order, the FWS additionally retained the CRA International consulting firm, who projected the economic impacts of the critical habitat designation above and beyond the baseline regulatory burden.  (Nov. 2, 2006 Order 47 (citing Admin R., Vol. 2, Doc. 358 45-46.)  CRA International also analyzed the administrative costs associated with Section 7 consultations for

---

[8]    It is of course possible that an agency conducting a coextensive analysis pursuant to Cattle Growers might also be continuing to follow the invalidated regulatory definition of adverse modification in 50 C.F.R. § 402.02, and thus would fail to adequately consider the recovery standard as required by Gifford Pinchot.  It is for this reason that the court's previous order noted that "[t]o the extent that the FWS relied on Cattle Growers and neglected to consider the effects of the critical habitat designation on species' recovery, pursuant to Gifford Pinchot, the critical habitat designation is not consistent with applicable Ninth Circuit precedent.  (Nov. 2, 2006 Order 57 n.22.)

1  listing a species, as well as the designation of a critical

2  habitat.  (Id. (citing Admin R., Vol. 2, Doc. 358 10.)

3        To the extent that the FWS's coextensive inquiry may

4  have insufficiently considered the recovery standard, by focusing

5  solely on those costs which are coextensive with listing, this

6  court's remand of the twenty three exclusions addresses that

7  deficiency.  However, it is not the coextensive analysis which is

8  faulty, but the lack of sufficient consideration of the ESA's

9  recovery standard.  Accordingly, this court declines to instruct

10 the FWS on remand that it may not conduct a coextensive

11 analysis.[9]

12              c.  Vacatur of Exclusions

13        Finally, the Environmental Groups seek vacatur of all

14 of the exclusions remanded back to the FWS.  Indeed, the general

15 rule is for a court to "hold unlawful and set aside agency

16 action, findings, and conclusions found to be arbitrary,

17 capricious, an abuse of discretion or otherwise not in accordance

18 with law."  5 U.S.C. § 706(2)(A).  While the court did find that

19 the FWS's exclusions were improper, and thus deserving of remand,

20 this does mandate vacatur.

21        Indeed, "when equity demands, the regulation can be

22 left in place while the agency follows the necessary procedures."

23

24        [9]    The court also notes the questionable nature of the
   Environmental Groups' request.  See INS v. Ventura, 537 U.S. 12,
25 16 (2002) ("Generally speaking, a court . . . should remand a
   case to an agency for decision of a matter that statutes place
26 primarily in agency hands."); Fed. Power Comm'n v. Idaho Power
   Co., 344 U.S. 17, 20 (1952) ("[T]he guiding principle . . . is
27 that the function of the reviewing court ends when an error of
   law is laid bare.  At that point the matter once more goes to the
28 [agency] for reconsideration.").

1  Idaho Farm Bureau Fed. v. Babbitt, 58 F.3d 1392, 1405 (9th Cir.

2  1995) (citing W. Oil and Gas v. EPA, 633 F.2d 803, 813 (9th Cir.

3  1980)).  Factors to be considered in deciding whether to vacate

4  or not include: (1) the purposes of the substantive statute under

5  which the agency was acting, (2) the consequences of invalidating

6  the agency action, and (3) and potential prejudice to those who

7  will be affected by maintaining the status quo. Weinberger v.

8  Romero-Barcelo, 456 U.S. 305 (1982).

9         Significant is the fact that, while the FWS has

10 committed error requiring remand, that error is minor in the

11 grand scheme of its analysis.  For this reason, the court found

12 the need to only grant the FWS 120 days in which to correct its

13 analysis.  Moreover, given the slight nature of the agency's

14 error, there is a legitimate possibility that the agency will be

15 able to substantiate its rule without altering the ultimate

16 substance.  Fox Television Stations, Inc. v. F.C.C., 280 F.3d

17 1027, 1048 (D.C. Cir. 2002) (citing Allied-Signal, Inc. v. United

18 States Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51(D.C. Cir.

19 1993) ("The decision whether to vacate depends on the seriousness

20 of the order's deficiencies (and thus the extent of doubt whether

21 the agency chose correctly) and the disruptive consequences of an

22 interim change that may itself be changed.").

23        Finally, the court notes its interest in intervening as

24 little as possible into an already incredibly complex

25 environmental regulation.  W. Oil, 633 F.2d at 813  ("We are also

26 influenced by the possibility of undesirable consequences which

27 we cannot now predict that might result from invalidation of the

28 designations.  Our intervention into the process of environmental

16

1   regulation, a process of great complexity, should be accomplished

2   with as little intrusiveness as feasible.  Under the unusual

3   circumstances of this case and guided by authorities that

4   recognize that a reviewing court has discretion to shape an

5   equitable remedy, we leave the challenged designations in

6   effect.")  In this court's prior order, it reasoned that the

7   balance of equity counsels in favor of leaving the rule in place,

8   and the Environmental Groups have not presented any reasoning as

9   to why this finding must be disturbed.  Accordingly, the

10  exclusions to the FWS's critical habitat designation will not be

11  vacated.

12          2.   Home Builders' Motion

13          Home Builders seeks reconsideration of this court's

14  prior order in two respects.  First, Home Builders asserts that

15  this court's decision to invalidate two of the twenty three

16  economic exclusions as arbitrary and capricious effectively

17  granted relief that no party sought.  (Home Builders' Mot. for

18  Recons. 1-2.)  Secondly, Home Builders argues that this court's

19  order did not adequately dispose of their argument that the FWS's

20  improperly employed a standard of qualifying an area as a

21  critical habitat designation as long as it contained one primary

22  constituent element.  (Id. 2-3.)

23          a.   Exclusion of UC Merced and Tehama County

24               Tracts

25          Home Builders contends that their motion for summary

26  judgment did not seek invalidation of any of the existing

27  economic exclusions, and thus this court's relief remanding two

28  existing economic exclusions (Highway 99 in Tehama County and the

                                17

development of the University of California at Merced) was
improper.  To the extent that Home Builders argues that this
court granted relief sought by no party, this contention is
incorrect.  Specifically, the Environmental Groups' motion for
summary judgment sought exactly such relief.  (Environmental
Groups Mot. for Summ. J. 25-28.) ("The elimination of these
twenty three census tracts should be set aside . . . .")  The
fact that the Environmental Groups chose to object to the
exclusions en masse does not mean that this court is limited to
only finding fault with all, or none, of the exclusions.  Both
Home Builders and the Environmental Groups called into question
the validity of the FWS's exclusion analysis, and the court found
fault with only a particular portion of such analysis.
Accordingly, the relief granted was not improper.

However, notwithstanding this fact, the court now takes
the opportunity on this motion to reevaluate its reasoning with
regard to the two tracts, and upon reconsideration, finds that it
was in error.  As noted in the November 2, 2006, order, an agency
"is obligated to 'articulate[] a rational connection between the
facts found and the choices made.'" Pac. Coast Fed'n of
Fishermen's Assocs. v. U.S. Bureau of Reclamation, 426 F.3d 1082,
1091 (9th Cir. 2005) (quoting NRDC v. Dep't of Interior, 113,
F.3d 1121, 1126 (9th Cir. 1997)).  At that point, it appeared to
the court that, while the FWS had indicated high costs for the
Merced and Tehama tracts, it had made no "relative comparison
amongst all tracts." (Nov. 2, 2006 Order 51.)  The FWS had given
"no indication that these two tracts are among the twenty-two
most impacted tracts," and at oral argument the Federal Defenders

18

1  were unable to articulate why this might be the case.  (Id.)

2        Upon reconsideration of the record, in particular the

3  June 30, 2005, Proposed Rule, 70 Fed. Reg. 37,739, and August 11,

4  2005, Final Rule, 70 Fed. Reg. 46,924, it now appears that the

5  FWS did sufficiently explain why the two tracts in question were

6  included.  In the Proposed Rule, the FWS indicated that it was

7  considering excluding the twenty highest cost areas, as

8  calculated in their draft economic analysis, and sought comments

9  explaining why any of these twenty should not be excluded, or

10  additional tracts should be excluded.  70 Fed. Reg. 37,740.  As

11  affirmed by this court's previous order, the FWS rationally

12  concluded that because "approximately 80 percent of the total

13  costs are represented by 25 percent of the critical habitat" in

14  these twenty tracts, exclusion was reasonable.  (Nov. 2, 2006

15  Order 49-50; 70 Fed. Reg. 37,740.)

16        However, as a result of the public notice and comment

17  period, the FWS learned of "additional costs" previously not

18  factored into its economic analysis, in the amount of

19  "$10,000,000 for UC Merced and $6,093,965 for Highway 99."  70

20  Fed. Reg. 46,950.  After adjusting their draft economic analysis

21  to account for this new information, the new estimated economic

22  costs of designating as critical habitat UC Merced and Highway 99

23  in Tehama became $15,759,870 and $11,453,799, respectively.  70

24  Fed. Reg. 46,949 (Table 2).  It is now clear that economic costs

25  of this magnitude do in fact place these two tracts well within

26  the "twenty-two most impacted tracts," and squarely within the

27  reasoning previously approved of.  Accordingly, the court will

28

1  amend its prior order.[10]

2              b.   Standard for Designating Critical Habitat

3          Home Builders' second request for clarification asserts

4  that this court failed to address their principal argument that

5  the Service violated the ESA by evaluating whether areas could be

6  designated as critical habitat based on whether they contain "one

7  or more of the species [Primary Constituent Elements ("PCEs")]."

8  (Home Builders' Mot. for Recons. 2.)  Home Builders presently

9  argues, as they previously did in their motion for summary

10 judgment, that every area designated as critical habitat must

11 contain all PCEs.  (Id.)

12         Home Builders' contention that this court neglected to

13 address their argument is without merit.  On page 35 of the

14 November 2, 2006, order, the court made clear in a lengthy

15 footnote that the particular nature of vernal pools, and their

16 need to be "fed by upland areas," means that a particular area

17 "may not be occupied by the species, and may not contain a vernal

18 pool . . . . Regardless of whether they contain a vernal pool, or

19 other PCEs, they are still essential to the conservation of the

20 15 vernal pool species."  (Nov. 2, 2006 Order 35 n.7.)

21         A motion for reconsideration "should not merely present

22 arguments previously raised."  Wetlands Water, 134 F. Supp. 2d at

23 1130 (citing Backlund, 778 F.2d at 138).  It is a "extraordinary

24 remedy," reserved for situations where the court has erred, or

25 _____

26      [10]   The court wishes to make clear that, while these two
particular tracts are no longer singled out and remanded based on
27 arbitrary economic analysis, (Nov. 2, 2006 Order 51), it remains
true, as discussed above, that all twenty-three tracts, including
28 these two, are remanded to the FWS for reconsideration consistent
with this court's order and the recovery standard in Gifford.

new relevant information has come to light.  Kona, 229 F.3d at

890.  It is not a forum for a party to attempt to reargue matters

already decided by the court.  Home Builders has already briefed

and argued this point, and the court has already ruled.  Other

than simply rehashing previous arguments, Home Builders has not

demonstrated why reconsideration is proper.  Accordingly, the

court declines to revisit the issue.

> B.   Regents' Motion to Intervene

The Regents are the true owners of the land being

developed as part of the University of California at Merced,

which was originally excluded from the critical habitat

designation in the FWS's August 11, 2005, final rule.  The

Regents have invested significant time and money into the

development of UC Merced Project, and the designation of their

land as critical habitat would no doubt interfere with their

development plans. (Regents' Mot. to Intervene 1.)  However, as

indicated in their motion, while they have closely monitored the

litigation, until now they have decided not to intervene because

the issues raised by the parties demonstrated that their

interests were adequately represented. (Id.)

Subsequent to this court's November 2, 2006, order, the

Regents sought to intervene based wholly on this court's singling

out of the UC Merced tract.[11]  They seek to intervene in order to

_____

[11]   "[The lack of a desire to intervene] changed, however, with the Court's SJ Order, which for the first time singled out the UC Merced Project, analyzed it separately from the remaining twenty-one Census tracts whose exclusion the court affirmed, and concluded that the Service's analysis for excluding just the UC Merced Project was insufficient." (Regents' Mot. to Intervene 1.)

protect their interests in the UC Merced Project, because they contend it is substantially and individually affected by this court's previous order.  However, as explained in Section II(A)(2)(a), supra, this court will now be amending its prior order, withdrawing any reference to the reasoning the Regents found objectionable.  Therefore, the Regents' justification for intervening is now moot.

Indeed, a cursory analysis of the standards for intervention as a matter of right and permissive intervention supports this conclusion.  Rule 24 allows intervention as a matter of right under various circumstances "unless the applicant's interest is adequately represented by existing parties."  Fed. R. Civ. P. 24(a).  Because the tract at UC Merced is no longer singled out for individual treatment, as the Regents themselves confess, their interests are sufficiently represented by the parties already involved in the case.  (Regents' Mot. to Intervene 1.)

Permissive intervention is allowed when an applicant's "claim or defense and the main action have a question of law or fact in common."  Fed. R. Civ. P. 24(b).  In this case, the Regents' unique claims have become moot--the reasoning in this courts previous order to which they are objecting will be withdrawn pursuant to this order.  (Regents' Mot. to Intervene 17) ("Regents' claims and defenses . . . are in direct response to determinations made by the Court['s November 2, 2006 order] in this action.")  Accordingly, the court will decline to grant the

1   Regents' motion.[12]

2       C.   <u>Timing on Remand</u>

3           In this court's previous order, it reasoned that

4   because the necessary changes were "simply an amendment to a

5   prior final designation . . . a 120 day deadline is more than

6   reasonable for this purpose."  (Nov. 2, 2006 Order 71 n.27)

7   (citing <u>Butte Environ. Council v. White</u>, 145 F. Supp. 2d 1180,

8   1185 (E.D. Cal. 2001) (allowing six months for the FWS to

9   complete a final critical habitat designation and noting that

10  many courts have allowed only 120 days for the same action)).

11  While this court is granting, in part, both motions for

12  reconsideration of the previous order, the substantive changes

13  are not great, and thus the issues on remand are similarly minor.

14  However, in light of the uncertainty created by both motions, the

15  court will grant the FWS 120 days from the issuance of <u>this</u> order

16  within which to complete the new critical habitat rule.

17  III. <u>Conclusion</u>

18          IT IS THEREFORE ORDERED that Environmental Groups'

19  motion for clarification, reconsideration, or amendment be, and

20  the same hereby is, GRANTED IN PART.  The entire paragraph

21  beginning on page 63 of this court's November 2, 2006, order, is

22  hereby WITHDRAWN.

23          IT IS FURTHER ORDERED that Home Builders' motion for

24  clarification, reconsideration, or amendment be, and the same

25  hereby is, GRANTED IN PART.  The two paragraphs on pages 50 and

26  _____

27      [12]   As this court indicated to the Regents at oral
    argument, however, if it becomes necessary for the Regents to
28  intervene at a later date (for example, to represent unique
    interests upon appeal) it may do so at that time.

                                23

51, as well the first paragraph on page 70, of this court's
November 2, 2006, order, regarding the remand specifically of the
exclusions of UC Merced and Tehama County, are hereby WITHDRAWN.

      IT IS FURTHER ORDERED THAT:

      (1) in all other respects, Environmental Groups' and
Home Builders' motions for reconsideration be, and the same
hereby are, DENIED;

      (2) the Regents' motion to intervene be, and the same
hereby is, DENIED;

      (3) this matter be, and the same hereby is, REMANDED to
the FWS for further action and consideration consistent with this
order, as well as the portions of this court's November 2, 2006
order not withdrawn above.  The FWS shall submit a new final
critical habitat rule to the Federal Register for publication
therein within 120 days of the date of this order.

DATED:  January 23, 2007

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

24